SUGAR INSTITUTE, INC. ET AL. *v.* UNITED
.STATES.

No. 268. Argued February 3,. 4, 1936.—Decided March 30, 1936.

*Mr. John C. Higgins,* with whom *Mr. Edward J. Mc-Gratty, Jr.,* was on the brief, for appellants.

556

562

*Messrs. Walter L. Rice* and *Angus D. MacLean,* with whom *Solicitor General Reed* and *Messrs. Charles H. Weston* and *Hammond E. Chaffetz* were on the brief, for the United States.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This suit was brought to dissolve The Sugar Institute, Inc., a trade association, and to restrain the sugar refining companies which composed it, and the individual defendants, from engaging in an alleged conspiracy in re-

straint of interstate and foreign commerce in violation of the Sherman Anti-Trust Act. 15 U. S. C. 1. Final decree was entered, which, while it did not dissolve the Institute, permanently enjoined the defendants from engaging directly or indirectly in forty-five stated activities. Defendants bring a direct appeal to this Court under the Act of February 11, 1903, 15 U. S. C. 29.

The record is unusually voluminous.[1] The court rendered an exhaustive opinion and made detailed findings of fact (218 in number) with conclusions of law, describing and characterizing the transactions involved. Numerous assignments of error broadly challenge its rulings, and the case has been presented here in extended oral arguments and elaborate briefs. We shall attempt to deal only with the salient and controlling points of the controversy. These involve (1) the special characteristics of the sugar industry and the practices which obtained before the organization of The Sugar Institute, (2) the purposes for which the Institute was founded, (3) the agreement and practices of the members of the Institute, and (4) the application of the Anti-Trust Act and the provisions of the decree.

*First.—The sugar industry and practices prior to the formation of The Sugar Institute.*—Domestic refined sugar, beet sugar, and foreign and insular refined sugar, known in the trade as "off-shore" refined, constitute about 99 per cent. of the Nation's supply. The remainder, consisting of domestic cane sugar, refined particularly in Louisiana, does not appear to be an important factor in the national markets. The fifteen defendant companies, members of the Institute, refine practically all the im-

---

[1] The court states: "The testimony is transcribed in over 10,000 typewritten pages; more than 900 exhibits covering many thousands of pages were introduced in evidence."

ported raw sugar processed in this country. Their product is known as "domestic refined." Prior to the organization of the Institute in 1927, they provided more than 80 per cent. of the sugar consumed in the United States, and they have since supplied from 70 to 80 per cent. Their proportion of the supply is even greater in the New England and Middle Atlantic States, being more than 90 per cent., while in all but a few States their share is more than 55 per cent. Each of the refiners is engaged extensively in interstate commerce. Their refineries are in the vicinity of Boston, New York, Philadelphia, Baltimore, Savannah, New Orleans, Galveston and San Francisco. The raw cane sugar which they use is imported principally from Cuba and to some extent from the insular possessions.

Beet sugar for many years has been an important factor in the domestic market. It is produced and sold chiefly in the middle and far West, providing in some States over 75 per cent. of the supply, and it competes with other sugars in a number of Southern and Middle Atlantic States. Off-shore sugar is refined principally in Cuba and to some extent in the insular possessions. Its important trade areas have been the Middle, Atlantic and Southern States; in some States it constitutes from 25 to 40 per cent. of the total supply. Both beet sugar and off-shore sugar are sold at a small differential below defendants' sugar. The trial court found that there was no agreement between defendants and the beet sugar manufacturers, or with the off-shore interests, to maintain any differential.

The court found that the defendants' refined cane sugar "is a thoroughly standarized commodity in physical and chemical properties." In exceptional cases and localities, certain of the defendants had built up a preference for brand names "sufficient before and after the Institute was organized to enable such brands to command a higher

price than the sugar of the other defendants in sales from sugar dealers to their trade." In sales by refiners to manufacturers of products containing sugar—about one-third of the sugar consumed—"price, not brand, was always the vital consideration." And in the other sales, "one refiner could not ordinarily, by virtue of preference for his brand, obtain a higher price except insofar as another refiner might be giving a lower price by secret concessions."

The court further found that the "basis prices," [2] quoted by the several refiners in any particular trade area, "were generally uniform both before and after the Institute, because economically the defendants' sugar, save for exceptional instances was and is a thoroughly standardized product."

It is a fundamental and earnest contention of defendants that the occasion for the formation of the Institute was the existence of grossly unfair and uneconomical practices in the trade, and that a proper appraisal of the motives and transactions of defendants cannot be made without full appreciation of the sorry condition into which the industry had fallen.

During the years 1917 to 1919, when the industry was under governmental control, prices were fixed and all forms of concessions and rebates were forbidden. The court found that, perhaps as early as 1921 and increasingly thereafter, the practice developed on the part of some, but not all, refiners of giving secret concessions. There were five refiners [3] who never indulged in that prac-

---

[2] The "basis price" is the price quoted at so much per pound per one hundred pound bag of "fine granulated" or "granulated" sugar. Contracts are closed with reference to this price but the purchaser has the option at stipulated differentials to specify for delivery an assortment of grades and packages.

[3] It appears that these five refiners accounted for 25.45 per cent. of all sugar produced by defendants; in 1931, for 28.54 per cent.

tice, but the others, called "unethical" refiners, did so to such an extent that at least 30 per cent. of all the sugar sold by the refiners in 1927 carried secret concessions of some kind. The need of secrecy was urgent, for as soon as it was known that a specific concession was granted it would be generally demanded. That concessions were widely granted was generally known in the trade, and while each refiner was able to find out in a general way the approximate prices and terms of his competitors, it was impossible to know with any degree of accuracy the actual prices and terms granted in the innumerable transactions. The court also found that various causes contributed to the development of these selling methods on the part of the unethical refiners, chief among which was an overcapacity since the war of at least 50 per cent. Other probable causes were the lack of statistical information as to amount of production, deliveries and stocks on hand, leading to over-production, the uncertainties prevailing in the market for raw sugar which made the refined sugar industry highly speculative, the fact that, since 1922, most sugar has been sold through brokers, and the standardization of defendants' products which made their sales almost entirely dependent upon prices, terms and conditions. The concessions granted were largely, although not entirely, arbitrary. They were given principally to large buyers, but no system was followed in that respect. Even though there may not have been extensive resort to misrepresentations, "defendants entertained genuine fears that purchasers were falsely representing prices which they said they could procure from competing sellers."

Consumption of sugar in the United States decreased in 1927. The public "slimness campaign" of that year had substantial effect in discouraging the use of sugar. Certain distributors refrained from pushing sales because they could not sell profitably, but others were aggressive

and sugar was generally available. While certain smaller distributors suffered because of the advantage enjoyed by some larger ones, that advantage was attributable in the greatest measure to efficiency, and the larger distributors did not obtain monopolies. The court found that there was "no substantial evidence that the situation caused, or would cause, substantial injury to the 'ethical' refiners as a class," although they may have been inconvenienced and probably believed that the sales methods of their competitors were harmful. The declining profits for the year 1927 were attributable at least in large part, the court found, to causes other than the secret concession system, such as the "slimness campaign," over-production and dumping.

But whatever question there may be as to particulars, the evidence and findings leave no doubt that the industry was in a demoralized state which called for remedial measures. The court summed up the facts in the following finding:

"29. The industry was characterized by highly unfair and otherwise uneconomic competitive conditions, arbitrary, secret rebates and concessions were extensively granted by the majority of the companies in most of the important market areas and the widespread knowledge of the market conditions necessary for intelligent, fair competition were lacking. The refiners were disturbed economically and morally over the then prevailing conditions. At least one refiner, American,[4] was concerned about the possibility of liability under the Clayton Act because of the discriminations resulting from the various concessions."

*Second.—The purposes for which the Institute was founded.*—Defendants emphasize the nature of the proceedings taken in the formation of the Institute. The

[4] The American Sugar Refining Company, which, in 1927, had 25.06 per cent. of all sugar produced by defendants.

court found that the refiners held a series of meetings, beginning in the summer of 1927, for a discussion of conditions "with particular reference to undesirable practices and secret concessions." In September of that year, there were submitted to the Department of Justice a proposed certificate of incorporation and by-laws for a trade association, together with a number of suggestions respecting trade practices. A "Code of Ethics" was likewise submitted to the Department of Justice and discussed with its officials, with the result that some changes were made, and the Code as concertedly adopted in January, 1928, was substantially identical with that worked out when those discussions were held. The court found that "with the exception of two minor changes, the Code has retained its original form." It has been supplemented from time to time by "Interpretations," that is, rulings interpreting or amplifying the provisions of the Code. The Department of Justice made three investigations of the Institute in 1928, 1929 and 1930 and had complete access to the files of the Institute. As new issues of the "Code" and "Interpretations" were printed, copies were forwarded to the Department.

Defendants stress their dealings with the Department of Justice as evidence of their good faith and of the propriety and legality of their purposes. "The functionings of the Institute," they insist, "were always under the eye of the Department." The court, however, found that the Department "was not notified of various important steps taken by the Institute in connection with illegal restraints," nor was it notified "as to those activities charged by the Government and denied by defendants in this case." The Department did not conduct a comprehensive investigation of the restraints here involved until the end of 1930.

Defendants urge that the abolition of the vicious and discriminatory system of secret concessions, through the

adoption of the principle of open prices publicly announced, without discrimination, was their dominant purpose in forming the Institute, and that other purposes were the supplying of accurate trade statistics, the elimination of wasteful practices, the creation of a credit bureau, and the institution of an advertising campaign. The court recognized the existence of these purposes in its finding:

"35. Among the purposes of the defendants in organizing the Institute were: (a) the selling of sugar on open, publicly announced prices, terms, and conditions; (b) the gathering of trade statistics not previously available; (c) the elimination of practices which they deemed wasteful; and (d) the institution of an advertising campaign to increase consumption. But these purposes were for the most part only incidental to defendants' actual dominant purposes in forming and operating under the Institute."

The "dominant purposes" were found to be as follows:

"36. I find that defendants' dominant purposes in organizing the Institute were: to create and maintain a uniform price structure, thereby eliminating and suppressing price competition among themselves and other competitors; to maintain relatively high prices for refined, as compared with contemporary prices of raw sugar; to improve their own financial position by limiting and suppressing numerous contract terms and conditions; and to make as certain as possible that no secret concessions should be granted. In their efforts to accomplish these purposes, defendants have ignored the interests of distributors and consumers of sugar."

Defendants charge that the finding as to the illegality of their dominant purposes was "wholly without foundation." They charge that the finding was built upon an "inherent suspicion" and not upon the evidence. The Government answers by pointing to the elaborate review

of the evidence in the court's opinion and findings. We think that it is manifest that the finding as to dominant purposes was not based upon any assumption *a priori*, but was an inference of fact which the court drew from the facts it deemed to be established with respect to the scope of the agreement between the members of the Institute and the actual nature and effect of their concerted action. The court found that the defendants "in most of their activities" had "gone much further than was reasonably necessary to accomplish their professed aims of eliminating fraud, waste and secret, unfair or illegal discrimination." The pith of the matter is in the following finding:

"37. At the inception of the Institute, defendants adopted a general agreement ostensibly to abolish all discriminations between customers but which in general purpose and effect amounted to an agreement not to afford different treatment to different customers, regardless of the varying circumstances of particular transactions or classes of transactions and regardless of the varying situation of particular refiners, distributors or customers or classes thereof. Under the guise of performing the agreement, against discriminations, defendants limited and suppressed numerous important contract terms and conditions in the particulars herein set forth, chiefly for the purpose and with the effect of accomplishing the objectives described in finding 36."

We turn to the transactions from which the inference of purpose is drawn.

*Third.—The agreement and practices of the members of the Institute.*—The evidence consists of the "Code of Ethics" and "Interpretations," oral testimony, the minutes of the Institute, and correspondence. Eliminating charges not sustained, the findings of restraints of trade rest upon the basic agreement of the refiners to

sell only upon prices and terms openly announced, and upon certain supplementary restrictions.

1. *The "basic agreement."*—The "Code of Ethics" provided as follows:

"All discriminations between customers should be abolished. To that end, sugar should be sold only upon open prices and terms publicly announced."

There was nothing new in the mere advance announcement of prices. The court found that prior to the Institute, "general price changes were listed on the Refiners' Bulletin Boards, and brokers, customers and news agencies were notified, and frequently, as a courtesy, competitors would be telephoned. Except for notifying the Institute, price changes during the post-Institute period have been announced in this way. . . . Before the Institute, general price changes, including general changes in the selling bases of the 'unethical' refiners, were disseminated and became known to the entire trade very quickly."

These price announcements must be considered in the light of the trade practice known as *"Moves."* The great bulk of sugar, as the court found, "always was and is purchased on what is known in the trade as 'Moves,' although very substantial quantities are sold from time to time apart from moves." A "move" takes place when the refiners make public announcements that at a fixed time they will advance their selling price to a named figure, either higher than the presently current selling price or higher than a reduced price which the announcements offer before the advance. Some period of grace was always allowed during which sugar could be bought at the price prevailing before the advance. And in order to obtain their sugar at the lower price, the trade, unless it was felt that the move occurred at too high a price, would then enter into contracts covering their needs for

at least the next thirty days. Defendants point out that in actual practice the initial announcement might be made by any one of the refiners and that the move actually takes place only if all refiners follow a similar course. If any one fails to follow with a like announcement, the others must withdraw their advance, since sugar is a completely standardized commodity.

Under the system of the Institute, there was no obligation to give the Institute the first notice of a change in price. The open announcements to the trade were to be made in the customary manner and notified to the Institute, which would relay the announcements. Prior to the Institute, when an advance in price was announced, the period of grace allowed for purchasing at the old price was uncertain. Sometimes it was very short, a matter of hours; sometimes sugar buyers who did not learn of the move in time, sent their orders in too late to buy at the old price. By an "interpretation," the Institute recommended that the members "announce changes in price not later than three o'clock." In its earlier form, this hour was to be that "of the day before the changed price becomes effective." But these words were deleted in 1929, and thereafter the announced price advances could be made effective at once. In practice, however, price advances continued to be announced to become effective the following day or even later. The court found that the effect of the "Three o'clock Rule," in and of itself, "seems to have been advantageous to the trade in case of a price advance in that the uncertain period of grace has been replaced by a definite one."

The court further found that the refiners "did not consult with one another after an advance had been announced by one of them and that the grace period was not in fact used by them to persuade a reluctant member to follow the example set, despite the business necessity of withdrawing an advance unless it were followed by

all." The court found "no agreement among defendants on basis prices in the sense of an agreement to adopt a certain basis price from time to time and to maintain it during any period. Frequently an announcement by one refiner of an advance would result in a series of announcements by others, ultimately leading to a decline. Often, too, the advance would be withdrawn because one refiner would refrain from following the announcement. Except in a few instances, a decline announcement was followed by all." "Data respecting price changes have been circulated by the Institute without comment" and there appear to have been no "price discussions" at Institute meetings.

There had been a practice in the trade called "Repricing,"—of "making price declines retroactive to sales made at previous higher price." That occurred usually when a decline was announced late in the day and was applied to all of that day's business. The court found that during the first few months of the Institute, defendants attempted to prevent repricing, but the prohibition proved impracticable and was abandoned. By a ruling in November, 1928, it was provided that "the custom of the trade permits the customer the benefit of the refiner's lowest price during the day, that is, a contract entered into or sugar delivered in the morning may be repriced at any lower price announced during the day." The court in its finding on this point stated that the ruling was evidently intended to prevent repricing beyond the period stated and "must have had some effect in discouraging it." Defendants challenge this criticism in view of the fact also found that refiners occasionally have repriced beyond the stated period, a practice which defendants say "had never prevailed in the pre-Institute period," and defendants insist that what the Code actually did was "to insure that repricing should be done publicly, with the benefit extended to all customers alike,

and not done secretly for the benefit only of the concessionaires."

The distinctive feature of the "basic agreement" was not the advance announcement of prices, or a concert to maintain any particular basis price for any period, but a requirement of adherence, without deviation, to the prices and terms publicly announced. Prior to the Institute, the list prices which many of the "unethical" refiners announced, "were merely nominal quotations and bore no relation to the actual 'selling bases' at which their sugar was sold. . . . The selling price was the price at which they purported to sell; the secret concessions were from this basis." And, in the case of some of the "unethical" refiners, changes in selling bases were made from time to time without formal public announcement in advance. The Institute sought to prevent such departures. As defendants put it: "Having adopted the principle of open prices and terms, without discrimination among customers, as the means of remedying the evils of the secret concession system, the defendants lived up to the principle." The court found:

"40. Under the Institute, defendants agreed to sell, and in general did sell sugar only upon open prices, terms and conditions publicly announced in advance of sales, and they agreed to adhere and in general did adhere without deviation, to such prices, terms and conditions until they publicly announced changes."

It was because of the range and effect of this restriction, and the consequent deprivation of opportunity to make special arrangements, that the court found that the agreement and the course of action under it constituted an unreasonable restraint of trade. The court deemed it to be reasonably certain that "any unfair method of competition caused by the secret concession system" could have been prevented by "immediate

publicity given to the prices, terms and conditions in all closed transactions," without an agreement to sell only on the basis "of open public announcement in advance of sales." A "purpose and effect" of that agreement, the court found, was to aid defendants in preventing and limiting "certain types of transactions in which private negotiations are essential." Its operation "tended in fact, as it naturally would tend, toward maintenance of price levels relatively high as compared with raws."

The court found that "the number of price changes for refined as compared to raw sugar" had been relatively less since the Institute than before. This was "too marked to be explained by the drop in raw prices." There was "a marked increase in margin and a substantial increase in profits despite a concededly large excess capacity." The relatively higher price level for the refined sugar, as compared with raw, was such "as to negate the prevalence of free competition." Factors "largely responsible" for this relative stability of prices "and for the maintenance of price levels regardless of supply and demand, observable since the Institute," were the dissemination among the refiners of statistical information, "while withholding it in large part from the buyers," and the steps taken by defendants "to eliminate the possibilities of price variations to distributors or ultimate purchasers at any given time and thereby to deprive them of the opportunity, by underselling, to disturb the price structure." Other factors were "the friendly coöperative spirit which the Institute brought to the Industry" and the assurance to each refiner that he need meet only the prices, terms and conditions announced by his competitors in advance of sales.

The court also took note of the fact that the Institute, in connection with practically all of its activities, had

obtained a high degree of coöperation "with the Domestic Sugar Bureau," the trade association of the domestic beet sugar manufacturers. That association had its "code of ethics," substantially identical with that of the Institute. There was also coöperation with the "offshore interests." But in neither case was there any agreement as to prices or price differentials.

Contending that the trial court fell into "fundamental error," defendants assert that the Institute made no change in the historic marketing system of the sugar industry. They say, first, that the code and its interpretations did not *in terms* call for price announcements in advance of sales. As to sales on "moves," they say that the code principle and price announcement interpretations "of course worked out in actual practice into sales only on prices and terms announced in advance of sales, because of the very nature and conditions of a sugar move." As to the "small day-to-day sales between moves," they say that while it was probably "the general understanding" that strict observance of the principle required public announcements of a lowered price or better terms before sale, there was no evidence as to the actual practice in that regard. They explain that the Institute continued to operate "under the move system" because it is "a natural growth essential to the economical conduct of the sugar business." The cost of raw sugar makes up about four-fifths of the cost of the refined sugar. Raw prices fluctuate widely from day to day and substantially control the price of refined. Wholesale and retail distributors sell on a narrow margin of five or ten cents a bag. They cannot afford to stock large supplies because of storage costs, dangers of deterioration and the hazardous nature of the business. But, on the other hand, distributors have to buy considerable quantities in order to take advantage of carload freight rates and handling costs. The result of all these forces is the system "of buying on

moves every month or two." To this, both large and small dealers have adapted themselves. By reason of the general practice, they are all on an equal footing as to the periodic fluctuations in price. On each move they have laid in a supply for a month or more. Having bought their current supplies at the same general market level the distributors must "sell out their current supplies with due regard to that level in order to avoid crippling losses from an intervening decline." This, defendants say, is "one of the greatest economic advantages of the move system."

Defendants concede the correctness of the statement of the trial court that if immediate publicity had been given to prices and terms in all "closed transactions," competitive pressure would have been so great that the refiners "would either have had to abandon the discriminatory concessions or extend them to all." They concede that it is *"publicity"* that prevents such concessions and "not the sequence in time between the sale and the publicity." But they raise the fundamental objection that the proposal is not adaptable to the sugar industry. They say that in an industry which "has traditionally, and for good reason, sold its products on 'moves,' through the mechanism of announcing price changes in *advance* of sales in order that buyers may have an opportunity to buy before the price rises, it is not helpful to suggest a system of announcing price changes *after* sales."

Defendants' argument on this point is a forcible one, but we need not follow it through in detail. For the question, as we have seen, is not really with respect to the practice of making price announcements in advance of sales, but as to defendants' requirement of adherence to such announcements without the deviations which open and fair competition might require or justify. The court below did not condemn mere open price announcements in advance of sales. The court was careful to say

in its opinion that it found it "unnecessary to pass upon the legality of the use of the Institute" for relaying such announcements, "if each refiner entirely independently of the others voluntarily made his own announcements without obligation to adhere thereto."

Defendants also review at length the relative prices and profits in the periods before and during the Institute. They insist that it is unfair to include in the comparison the earnings for either 1927 or 1928, because each year was abnormal, and they contend that if a truly representative comparison of results were obtained by using the years 1925 and 1926 as the pre-Institute years, and those for 1929 and 1930 as the post-Institute years, it would appear that the increase in the later period of the net earnings of the refiners was less than one-half of one per cent. Accordingly they reach the conclusion that their activities did not actually restrain, or tend to restrain, effective competition.

But we are not left to inferences from trends of prices and profits. The "basic agreement" cannot be divorced from the steps taken to make it effective, and the requirements of the Institute must be viewed in the light of the particular opportunities which they cut off or curtailed. The crucial question—whether, in the ostensible effort to prevent unfair competition, the resources of fair competition have been impaired—is presented not abstractly but in connection with various concrete restrictions to which the decree below was addressed.

2. *Supplementary restrictions.*—The requirements and practices designed to support the basic agreement, and which the trial court condemned, relate to the employment of brokers and warehousemen, transportation, consignment points, long-term contracts, quantity discounts and other contract terms and conditions, and to the withholding of statistical information.

(a) *Brokers and warehousemen.*—Most of defendants' sales are negotiated through brokers who receive their commissions from the refiners. The court found that prior to the Institute, a broker and a warehouseman "were frequently one," and might also be "a merchant or other sugar user"; that concerns which thus combined distribution functions frequently performed a valuable service to the industry; that defendants required an election of but one of these activities and the complete cessation of each of the others; that defendants made and rigorously enforced an agreement that refiners should refuse to deal with a broker, warehouseman or customer who acted directly or indirectly for any of them, or for any other sugar interest, "in other than the one elected capacity"; that each refiner submitted to the Institute lists of its brokers and warehouses which were then circulated among the refiners, and those disqualified were dropped from the lists; that this policy was carried out in a harsh and arbitrary manner without regard to the effect upon third parties; that the commissions to be paid brokers were agreed upon, but there was no substantial evidence that the commissions were not fair, the object being to prevent a growing competition in bidding for brokers' services; that defendants agreed that they would not deal with any broker or warehouseman who did not sign a contract according to a form recommended by the Institute; that the warehouse agreement provided that if the warehouseman granted any concession or rebate, secret or otherwise, to any customer without granting it to all, an equal amount should be forfeited to the employing refiner; that the brokers' agreement prohibited concessions and imposed an obligation to uphold the Institute's code and its interpretations. This course of dealing, the court held, unreasonably restrained trade.

Defendants urge that the broker is the refiner's agent to sell to customers and the warehouseman is the refiner's

588

agent for storage and delivery; that these agents act as a check on each other; that the refiners' concerted adoption of the principle against storing in customers' and brokers' warehouses was essential both to prevent discrimination among customers and to avoid impositions and frauds upon the refiners; that if the warehouseman is himself the purchaser of the sugar, the refiner is deprived of his independence and disinterestedness and the purchaser has control of the sugar with the power of withdrawing it at will and reporting that withdrawal at his pleasure; that similarly storage with brokers facilitated fraudulent practices, and that where the warehouseman and the broker were the same, neither was under any supervision and the broker-warehouseman could do practically what he pleased with the refiner's property and business.

To a considerable degree the court recognized the force of these contentions. The court found that a combination of distribution functions facilitated secret concessions, difficult of detection, and created opportunities for double dealing. But, despite this, it had been common for refiners, before the Institute, to employ brokers and warehousemen engaged in other distribution functions, and that such arrangements from the refiners' viewpoint were not infrequently entirely successful; and that concerns in substantial numbers, which combined distribution functions, maintained entire good faith in their dealings with the refiners. The court concluded that there was a definite possibility of lower prices to ultimate consumers as a result of combination of functions, because the increased income thus made possible, even apart from advantages obtained through secret concessions and fraudulent practices, gave opportunity "to outsell competitors who engage in only one occupation." The most important purpose of defendants, the court found, in compelling the separation of occupations was to aid in preserving "the uniformity of price structure," which would

otherwise be threatened. The court deemed it reasonably certain that defendants could have secured adequate protection against illicit practices by means far less drastic, that is, through investigations, inspections, and publicity for which the Institute had unlimited resources.

The finding of purpose and of the adequacy of alternative measures is sharply contested. But, while the parties present their respective views as to the details of evidence, there is no room for doubt as to the nature and effect of the restrictions actually imposed through the Institute. The findings of the court as to agreement and practice are fully supported.

(b) *Transportation.*—The custom of the trade was to quote sugar f. o. b. refinery. Since the price was usually the same or varied but slightly, individual refiners sold in areas enjoying lower freight rates from other refineries by paying or absorbing part of the transportation charges. That is, the refiner added to the refinery price the amount of his "ruling freight basis" or "freight application," which was the amount the customer was to pay as distinguished from the actual cost of the transportation. The freight situation was complicated by the existence of differential routes, involving all-water or a combination of water and rail transportation. Traditionally in the industry, refiners' freight applications on sugar delivered at Great Lakes ports openly broke down during the season of open navigation to the Philadelphia lake and rail rate, and during 1926 and 1927 the freight application on sugar sold in the Warrior River area (Alabama, Tennessee, Kentucky and parts of Indiana) had openly broken down to New Orleans barge rates, regardless of the way in which the sugar actually moved. The areas affected by these breakdowns were of vital importance, as competition there was especially keen.

In the effort to prevent the "sale" of transportation below "cost," the Code of Ethics, paragraph 3 (c), con-

demned "The use of differential rates on consignments, or otherwise than on direct shipments over differential routes at customers' request." This policy was amplified by an interpretation. The trial court found that but "slight effort was made to enforce Code 3 (c) after the summer of 1928," that it "was abandoned at least by the fall of 1929 and probably much earlier," and that the code interpretation was finally rescinded in September, 1930.

The court found that the transportation problems in the Great Lakes and Warrior River areas were finally solved by a system of delivered prices, with denial of the privilege of purchasing f. o. b. refinery. The court did not find that there was an agreement in introducing the delivered prices, but did find that defendants "agreed to maintain and concertedly maintained the system of delivered prices" in both the areas above mentioned; also that through the Institute defendants "concertedly policed delivered prices and investigated alleged departures therefrom"; and that these prices were "patently unreasonable." Defendants vigorously deny that delivered prices were either introduced or maintained through any concert of action. They submit that the evidence not only does not warrant that finding, but shows affirmatively that delivered prices were introduced independently by individual refiners and resulted solely from unrestrained competition.

As the court said in its opinion, the controversy was chiefly about what defendants had actually done during the Institute period, and the facts were frequently "bitterly disputed." We need not discuss the rival contentions. The court found that defendants' "adoption of Code 3 (c), their actions pursuant thereto, and their concerted maintenance of delivered prices constituted undue and unreasonable restraint of trade." Defendants have waived their assignment of error as to this finding in

order to reduce the issues presented on this appeal. And defendants have also waived their assignments of error as to the provisions in the decree enjoining concerted action in "Determining transportation charges or freight applications to be collected from customers, or limiting freight absorptions" and in "Selling only on delivered prices or on any system of delivered prices, including zone prices, or refusing to sell f. o. b. refinery."

Questions are presented with respect to miscellaneous "transportation activities." They relate to defendants' agreement to prevent transiting and diversion by customers when these would defeat freight applications; to concerted action in obtaining an agreement from transportation companies operating on the New York State Barge Canal that they would carry sugar only on the basis of openly announced rates and terms from which they would not deviate without open announcement; to recommendations of the Institute, concertedly observed, that none of the members should ship sugar on his own account by private charter except when the charter was arranged directly between refiner and carrier and refiner was satisfied that no broker, buyer or warehouseman was participating in the rate, and that the terms of every such private charter should be submitted to the scrutiny of the executive secretary of the Institute; to defendants' concerted refusal to participate in pool shipments, with sugar shipped on their own account, in order to aid customers in making up the required minima for cargo or carload rates; and to defendants' agreement "to use only trucking concerns not affiliated with any buyer, broker, or warehouse and then only under non-rebating contracts." The court found that defendants' action went further than was necessary to prevent secret rebating and amounted to unreasonable restraints. We see no reason for disturbing the findings on these subjects.

(c) *Consignment points.*—Prior to 1925, the refiners maintained, on their respective accounts, stocks at

a few strategic points from which sugar was distributed to the surrounding areas. During the period 1925 to 1927, refiners placed stocks at numerous points solely for the local trade. Defendants regarded this increase as an outstanding evil and made a concerted effort to bring about reductions. To this end the Institute obtained the coöperation of the Domestic Sugar Bureau and other non-members. In recommending consignment points in the South, ports of entry like reconsignment points were separately classified, and Wilmington, North Carolina, was eliminated.

Defendants insist that the expense involved in maintaining an excessive number of consignment points was an economic waste without any substantial compensating advantage to the consuming public, and that the effort at reduction was a legitimate function of the Institute. The economic questions were fully considered by the trial court which found that the refiners' consignment service "was valuable and beneficial to substantial elements in the trade"; that limitation of ports of entry was more serious than elimination of ordinary consignment points insofar as it shut a competitor out of a particular territory; that while the cost of increased consignment points might well be reflected in a higher general basis price, there was no assurance that the savings through some reductions would be passed on to consumers generally; that the result in either case was "largely speculative"; that communities eliminated as consignment points "suffered as against neighboring ones" because of the advantage accruing to the latter; and that there were also eliminated from distributing agencies one type of jobber called the "desk jobber" who was able to do business without any stock of his own. In summary, the court found that defendants' "concerted conduct with respect to elimination and reduction of consignment points, reconsignment points and ports of entry" unreasonably re-

strained trade. The controlling facts are established, and the question again is one of justification.

(d) *Various contract terms and conditions.*—One question relates to *"long term contracts,"* that is, those permitting the buyer to take delivery more than thirty days after date. Prior to the World War, thirty day contracts were customary for all except manufacturers who were granted sixty days. While there was no definite practice after the war, long term contracts were not infrequent. They were granted by California refiners to Pacific Coast canners. The court found that long term contracts had "a real economic value to refiner and to consumer"; that some of them tend to bring about greater evenness of production through the year, thus effectuating economies and enabling manufacturers promptly to know the cost of this element of their finished products.

Defendants contest the finding of the court that they engaged in concerted action "in prohibiting all long term contracts," and assert that "they never have had and do not now have any desire to prohibit them." Hence, they add, the court's injunction against such action "does not disturb them." But they object to the finding that concerted action in insisting upon open announcement in advance of entering into such contracts was without justification. This, as defendants say, is but a condemnation of a particular application of their basic principle that sugar should be sold only upon open prices and terms without discrimination. In the view of the trial court, this application is an illustration of its point that an obligation to adhere to such advance announcements "would tend to prevent many entirely fair contracts." Of similar import is the finding that defendants were not justified in acting concertedly to determine whether and to what extent "the rigid enforcement of the thirty day contract" should be relaxed.

Another question which has received extended consideration is that of *"quantity discounts."* Prior to the Institute, there was no systematic practice in this respect. The majority of discounts were given to the large buyer but they were often granted to the smaller buyer as well, and the amount of the discount "bore little relation to the amount of the purchases or the method of taking delivery." This, the court found, was the natural result of the "secret concession system" which had prevailed. Carrying out its policy as to discriminations, the Institute condemned "as unbusinesslike, uneconomic and unsound, concessions made to purchasers on the basis of quantity purchased." The court found that this agreement and the practice under it prohibited not only "unsystematic and secret quantity discounts," but also discounts "systematically graded according to quantity." The court examined defendants' contention that quantity discounts would effect no economies. If, said the court, the facts were as defendants insisted, the question would arise whether such a concerted restraint was reasonable. But the court considered the actual facts to be "entirely inconsistent with defendants' position." As to direct costs, the court found that the refiners got no discount for quantity purchases of raws, which constitute about 80 per cent. of the cost of refined; that quantity sales effected no appreciable direct savings in manufacturing costs and no savings in brokerage; but that in sales to those who could take deliveries in carload lots direct from the refinery, there were substantial savings "in delivery, storage, bookkeeping and other incidental expenses." And as to indirect costs, the court found that sales which distribute production more evenly through the year effect substantial savings to the refiners and that the demand for sugar is elastic, so that encouragement of large sales through quantity discounts might reasonably be expected to build up total production and thus effect economies.

Also that a quantity discount to wholesalers selling to manufacturers as well as to manufacturers buying directly from refiners, might well result in a substantial increase in sugar consumption.

Defendants contest these economic conclusions. But we are not convinced that the findings are contrary to the evidence. Moreover, the limited provision of the decree should be regarded. In this relation, the decree enjoins defendants from concerted action in "Preventing, restraining or refusing to grant quantity or other discounts where such discounts reflect, effect, or result in economies to refiners either in direct or indirect costs."

With a single exception, defendants do not ask the court to review the findings with respect to credit arrangements known as "the four payment plan," "split billing" and "cash discount"; or as to "price guarantee" and "second hand sugar or resales." They say that in each case questions of fact alone are raised and they disclaim having taken, or having any desire to take, any action with respect to these subjects which is enjoined by the decree. .The exception refers to the practice of "requiring buyers to elect and specify at the time of entering contract, without privilege of change, the prices and/or terms in cases where the refiner had more than one price or different terms in different or the same territories." This restriction is defended as a necessary corollary of the principle of open prices and terms without discrimination, and the question is as to the legality of the restraint in the application of that principle.

Other questions concern practices in relation to "damaged sugar and frozen stocks," "tolling," "used bag allowances," and "private brands." The court found that the restraints imposed in these matters were unreasonable. They appear to be of minor importance and we think it unnecessary to state the particular facts.

(e) *Statistical information.*—Some statistical information collected by the Institute was supplied only to its members; some was supplied as well to representatives of offshore refiners. The data disseminated by the Institute to the purchasing trade consisted of weekly statistics as to the total melt (production) and total deliveries, and monthly statistics of total deliveries, of all sugar, divided so as to show the amount of domestic cane, imported cane, and beet sugar delivered during the period. These statistics were widely distributed through news agencies, banks and brokers. The total refined stocks on hand could be computed by subtracting from the total melt of each week the total deliveries. During recent years when refined stocks were greatly increasing, defendants continued to supply to the trade weekly statistics on melt and deliveries from which the trade could readily calculate the increase. Data as to the capacity of the several refiners were available to the public in substantially similar form to that obtained by the Institute. It also appeared that in May, 1931, after the present suit was begun, statistics were released to the trade showing the total consumption of cane, beet, foreign and insular refined sugar by States, for the years 1928, 1929 and 1930, together with figures showing the *per capita* consumption of each State during the same years.

The trial court found that none of the other statistics supplied to members or offshore refiners were available except through the Institute and none were supplied or available to the trade. What the court considered to be "vital data" relating to production and deliveries of individual refiners, to deliveries by States, to deliveries by States by all the important differential routes, to consigned and in-transit stocks for the several States, "which would have illuminated the situation in the several trade areas where the competitive set-ups differed widely," were withheld from purchasers. The court concluded

that, by collecting and circulating only among themselves that information, defendants obtained an unfair advantage with respect to purchasers and effected an unreasonable restraint.

The court took the view that the statistics relating to total production, total deliveries, and calculable stocks, which defendants did make available, could have had only limited significance for the individual purchaser and were even likely to mislead him. Such information reflected only the general situation for the country as a whole and for all refiners. Defendants challenge this criticism and emphasize the value of the information they gave. And with respect to the statistics not disseminated, they say that it did not appear how buyers were prejudiced and that the sole reason that the information was not published was "because the refiners had no reason to believe that the buyers wanted it." We cannot say, however, that the finding of the trial court, in connection with its exhaustive examination of conditions in the trade, is without adequate support. We shall presently consider the criticism from a legal standpoint of the breadth of the provision in the decree relating to the duty of dissemination.

*Fourth.—The application of the Anti-Trust Act and the provisions of the decree.*—The restrictions imposed by the Sherman Act are not mechanical or artificial. We have repeatedly said that they set up the essential standard of reasonableness. *Standard Oil Co. v. United States,* 221 U. S. 1; *United States v. American Tobacco Co.,* 221 U. S. 106. They are aimed at contracts and combinations which "by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restraining competition or unduly obstructing the course of trade." *Nash v. United States,* 229 U. S. 373, 376; *United States v. Linseed Oil Co.,* 262 U. S. 371, 388, 389. Designed to frustrate unreasonable

restraints, they do not prevent the adoption of reasonable means to protect interstate commerce from destructive or injurious practices and to promote competition upon a sound basis. Voluntary action to end abuses and to foster fair competitive opportunities in the public interest may be more effective than legal processes. And coöperative endeavor may appropriately have wider objectives than merely the removal of evils which are infractions of positive law. Nor does the fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, require that abuses should go uncorrected or that an effort to correct them should for that reason alone be stamped as an unreasonable restraint of trade. Accordingly we have held that a coöperative enterprise otherwise free from objection, which carries with it no monopolistic menace, is not to be condemned as an undue restraint merely because it may effect a change in market conditions where the change would be in mitigation of recognized evils and would not impair, but rather foster, fair competitive opportunities. *Appalachian Coals* v. *United States,* 288 U. S. 344, 373, 374. Further, the dissemination of information is normally an aid to commerce. As free competition means a free and open market among both buyers and sellers, competition does not become less free merely because of the distribution of knowledge of the essential factors entering into commercial transactions. The natural effect of the acquisition of the wider and more scientific knowledge of business conditions on the minds of those engaged in commerce, and the consequent stabilizing of production and price, cannot be said to be an unreasonable restraint or in any respect unlawful. *Maple Flooring Assn.* v. *United States,* 268 U. S. 563, 582, 583. In that case, we decided that trade associations which openly and fairly gather and disseminate information as to the cost of their

product, the volume of production, the actual price which the product has brought in past transactions, stocks of merchandise on hand, approximate costs of transportation, without reaching or attempting to reach an agreement or concerted action with respect to prices or production or restraining competition, do not fall under the interdiction of the Act. *Id.*, p. 586. See, also, *Cement Manufacturers Assn.* v. *United States,* 268 U. S. 588, 604, 606.

The freedom of concerted action to improve conditions has an obvious limitation. The end does not justify illegal means. The endeavor to put a stop to illicit practices must not itself become illicit. As the statute draws the line at unreasonable restraints, a coöperative endeavor which transgresses that line cannot justify itself by pointing to evils afflicting the industry or to a laudable purpose to remove them. The decisions on which defendants rely emphasize this limitation. In *Chicago Board of Trade* v. *United States,* 246 U. S. 231, the Court found the assailed rule to be a reasonable regulation in a limited field. In the case of *Appalachian Coals, supra,* p. 375, the Court found that abundant competitive opportunities would exist in all markets where defendants' coal was sold, and that nothing had been shown to warrant the conclusion that defendants' plan would have an injurious effect upon competition in those markets. In *Standard Oil Co.* v. *United States,* 283 U. S. 163, relating to contracts concerning patents for cracking processes in producing gasoline, an examination of the transactions involved led to the conclusion "that no monopoly of any kind or restraint of interstate commerce" had been effected "either by means of the contracts or in some other way." *Id.,* p. 179. And while the collection and dissemination of trade statistics are in themselves permissible and may be a useful adjunct of

fair commerce, a combination to gather and supply information as a part of a plan to impose unwarrantable restrictions, as, for example, to curtail production and raise prices, has been condemned. *American Column Co.* v. *United States,* 257 U. S. 377, 411, 412; *United States* v. *Linseed Oil Co., supra; Maple Flooring Assn.* v. *United States, supra,* pp. 584, 585.

We have said that the Sherman Act, as a charter of freedom, has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions. Thus in applying its broad prohibitions, each case demands a close scrutiny of its own facts. Questions of reasonableness are necessarily questions of relation and degree. In the instant case, a fact of outstanding importance is the relative position of defendants in the sugar industry. We have noted that the fifteen refiners, represented in the Institute, refine practically all the imported raw sugar processed in this country. They supply from 70 to 80 per cent. of the sugar consumed. Their refineries are in the East, South, and West, and their agreements and concerted action have a direct effect upon the entire sugar trade. While their product competes with beet sugar and "offshore" sugar, the maintenance of fair competition between the defendants themselves in the sale of domestic refined sugar is manifestly of serious public concern. Another outstanding fact is that defendants' product is a thoroughly standardized commodity. In their competition, price, rather than brand, is generally the vital consideration. The question of unreasonable restraint of competition thus relates in the main to competition in prices, terms and conditions of sales. The fact that, because sugar is a standardized commodity, there is a strong tendency to uniformity of price, makes it the more important that such opportunities as may exist for fair competition should not be impaired.

Defendants point to the abuses which existed before they formed the Institute, and to their remedial efforts. But the controversy that emerges is not as to the abuses which admittedly existed, but whether defendants' agreement and requirements went too far and imposed unreasonable restraints. After a hearing of extraordinary length, in which no pertinent fact was permitted to escape consideration, the trial court subjected the evidence to a thorough and acute analysis which has left but slight room for debate over matters of fact. Our examination of the record discloses no reason for overruling the court's findings in any matter essential to our decision.

In determining the relief to be afforded, appropriate regard should be had to the special and historic practice of the sugar industry. The restraints, found to be unreasonable, were the offspring of the basic agreement. The vice in that agreement was not in the mere open announcement of prices and terms in accordance with the custom of the trade. That practice which had grown out of the special character of the industry did not restrain competition. The trial court did not hold that practice to be illegal and we see no reason for condemning it. The unreasonable restraints which defendants imposed lay not in advance announcements, but in the steps taken to secure adherence, without deviation, to prices and terms thus announced. It was that concerted undertaking which cut off opportunities for variation in the course of competition however fair and appropriate they might be. But, in ending that restraint, the beneficial and curative agency of publicity should not be unnecessarily hampered. The trial court left defendants free to provide for immediate publicity as to prices and terms in all closed transactions. We think that a limitation to that sort of publicity fails to take proper account of the practice of the trade in selling on "moves," as already de-

scribed, a practice in accordance with which the court found that "the great bulk of sugar always was and is purchased." That custom involves advance announcements, and it does not appear that arrangements merely to circulate or relay such announcements threaten competitive opportunities. On the other hand, such provision for publicity may be helpful in promoting fair competition. If the requirement that there must be adherence to prices and terms openly announced in advance is abrogated and the restraints which followed that requirement are removed, the just interests of competition will be safeguarded and the trade will still be left with whatever advantage may be incidental to its established practice.

*The decree.*—The court below did not dissolve the Institute. The practices which had been found to constitute unreasonable restraints were comprehensively enjoined. The injunction restrains defendants "individually and collectively, in connection with the sale, marketing, shipment, transportation, storage, distribution or delivery of refined sugar," from engaging with one another or with any competitor through any *"program"* in any of the activities separately described. The decree defines "program" as "any agreement, understanding or concerted action, including, but without limiting the generality of the foregoing, any rule, policy or code provision or interpretation, concertedly adopted or maintained."

Then follow forty-five specifications of prohibited action. As to seventeen of these paragraphs, defendants have withdrawn their assignments of error.

Paragraphs one and two of the specifications enjoin the carrying out of the open price plan so far as it seeks to compel uniform terms, regardless of circumstances, and

an adherence to prices, terms, etc. announced in advance. These paragraphs cover any agreement or concerted action in

"1. Effectuating any general plan to give the same terms, conditions, or freight applications to customers, regardless of the varying circumstances of particular transactions or classes of transactions or regardless of the varying situation of particular refiners, distributors or customers or classes thereof;

"2. Selling only upon or adhering to prices, terms, conditions or freight applications announced, reported or relayed in advance of sale or refraining from deviating therefrom."

In view of those provisions, and of the other forty specified restrictions, we think that paragraphs three, four and five with respect to the reporting or relaying of information as to current or future prices should be eliminated. These paragraphs are as follows:

"3. Effectuating any system for or systematically reporting to or among one another or competitors or to a common agency, information as to current or future prices, terms, conditions, or freight applications, or lists or schedules of the same;

"4. Relaying by or through The Sugar Institute, Inc., or any other common agency, information as to current or future prices, terms, conditions, or freight applications or any list or schedule of the same;

"5. Giving any prior notice of any change or contemplated change in prices, terms, conditions, or freight applications, or relaying, reporting or announcing any such change in advance thereof."

Such reporting or relaying, as we have said, permits voluntary price announcements by individual refiners, in accordance with trade usage, to be circulated, and sub-

ject to the restrictions imposed by the decree does not appear to involve any unreasonable restraint of competition.

Paragraph seven relates to the collection and dissemination of statistical information, as follows:

"7. Effectuating any system of gathering and/or disseminating statistical information regarding melt, sales, deliveries, stocks on hand, stocks on consignment, stocks in transit, volume of sugar moved by differential or other particular routes or types of routes, new business or any other statistical information of a similar character, wherever and to the extent that said information is not made, or is not readily, fully and fairly available to the purchasing and distributing trade."

This provision was based upon the finding that "Perfect competition and defendants' professed policy of fostering such competition require that the purchasing trade as well as the sellers have the full, detailed information which defendants withheld." That ruling has appropriate reference to the statistical data which are specified in paragraph seven and to the withholding of which we have referred. In those data the purchasing and distributing trade have a legitimate interest. But it does not follow that the purchasing and distributing trade have such an interest in every detail of information which may be received by the Institute. Information may be received in relation to the affairs of refiners which may rightly be treated as having a confidential character and in which distributors and purchasers have no proper interest. To require, under the penalties of disobedience of the injunction, the dissemination of everything that the Institute may learn might well prejudice rather than serve the interests of fair competition and obstruct the useful and entirely lawful activities of the refiners.

In this view we think that the clause in paragraph seven "or any other statistical information of a similar

character" should be eliminated. The preceding specifications as to melt, sales, deliveries, stocks on hand, on consignment, or in transit; and as to transportation and new business, appear to be adequate. The words "of a similar character" have no clearly defined meaning and would place the defendants under an equivocal restriction which may do more harm than good. With the removal of that clause and the placing of the word "and" before the words "new business," paragraph seven is approved.

Following the provisions for injunction, the decree properly provides that jurisdiction is retained for the purpose of "enforcing, enlarging or modifying" its terms. It is further provided that the injunction is without prejudice to application by any party for modification in order to permit the adoption of any "program" that may be permissible under "the National Industrial Recovery Act" of June 16, 1933, or the "Emergency Farm Relief Act" of May 12, 1933, or "any other present or future statutes of the United States." This subdivision of the decree should be modified so as to refer simply to "any applicable Act of Congress."

The decree is modified in the particulars above stated and, as thus modified, is affirmed.

*Modified and affirmed.*

MR. JUSTICE SUTHERLAND and MR. JUSTICE STONE took no part in the consideration and decision of this cause.