### UNITED STATES MALTSTERS ASS'N et al. v. FEDERAL TRADE COMMISSION.

#### No. 8429.

Circuit Court of Appeals, Seventh Circuit.

Nov. 24, 1945.

Russell Baker and Edward R. Johnston, both of Chicago, Ill., and William W. Corlett, of New York City, for petitioner.

Wm. T. Kelley and Walter B. Wooden, both of Washington, D. C., for respondent.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This is a joint and several petition to review a modified cease and desist order entered by the Federal Trade Commission on August 13, 1943. Petitioners consist of some eighteen manufacturers of malt (hereinafter sometimes referred to as the members or maltsters) and their trade association operating as United States Maltsters Association (hereinafter referred to as the association). The complaint alleged that the members on or about August 15, 1930, for the purpose of eliminating price competition among themselves, entered into, through and by the association "an agreement, combination, understanding and conspiracy among themselves to fix and maintain, and by which they have fixed and maintained, uniform delivered prices." Voluminous testimony both oral and documentary was heard by the Commission. Findings of fact and conclusions were thereupon made by the Commission, upon which its modified order, now sought to be reviewed, is predicated.

The primary issue for decision is whether the findings of the Commission are supported by competent evidence, and especially the finding that petitioners by agreement and understanding effected a combination and conspiracy to restrain and suppress price competition. It is true numerous oth-

er contested issues are stated. Such issues, however, so we think, are merely incidental to the primary issue.

The association is an unincorporated, voluntary trade association formed in 1930 under the name of Bureau of Barley and Malt Statistics, which was changed in 1933 to United States Maltsters Association. Its membership includes more than a majority of the commercial maltsters in the country. The members as well as non-member maltsters are engaged in the manufacture of malt, which is sold principally to breweries. There are three recognized grades of brewer's malt—standard, choice and fancy. So far as need be noticed in the instant proceeding, malt is sold to distillers and breweries for the production of beer and other malt products. Both prior and subsequent to the organization of the association, such malt has been sold to breweries and others solely on a delivered price basis. Malting barley from which malt is made is largely grown in the four principal barley producing states, Wisconsin, Minnesota, North Dakota and South Dakota, and to a limited extent in the states of Iowa, Michigan and Illinois. It is purchased principally in the terminal markets of Minneapolis, Milwaukee and Chicago. Lesser quantities are purchased directly from farmers and county elevators.

Of the eighteen maltsters, members of the association, all are located in the state of Wisconsin or in the city of Chicago, Illinois, with the exception of four. Of these latter, one is located at Detroit, Michigan, two at Buffalo, New York, and one at Philadelphia, Pennsylvania, with its plant at Buffalo. Three of the Wisconsin maltsters have plants located in the state of Minnesota. The members represent approximately 64% of the total malting capacity of the United States, and approximately 75% of the malting capacity engaged in commercial malting. Approximately 77% of the total capacity of the members in the year 1939 was represented by malt plants located in Illinois and eastern Wisconsin.

■ A narration of the facts in detail would serve no useful purpose. Petitioners, as is ofttimes the case, seem to proceed on the theory that it is the function of this court to review the voluminous evidence in appraising the validity of the Commission's findings. As has often been stated, however, our function is limited solely to an inquiry as to whether the record furnishes substantial support for such findings. In making this inquiry, we are not permitted to weigh the evidence and it is of no consequence that we might disagree with the Commission's findings if the issues were presented to us as an original proposition.

■ Keeping in mind that the crucial issue arises as a result of the Commission's finding that petitioners by agreement or concerted action fixed the price at which their product was sold, we turn at once to that phase of the case. As might be expected, there is little, if any, direct proof of an express agreement. Such proof, however, is not necessary. The agreement may be inferred or implied from the acts and conduct of the parties as well as circumstances pertinent thereto. See Bigelow et al. v. RKO Radio Pictures, Inc., et al., 7 Cir., 150 F.2d 877, and cases therein cited, decided by this court August 3, 1945. In this connection, we note that petitioners assail certain testimony heard by the Commission consisting in the main of statements supposed to have been made by certain of petitioners concerning a price fixing agreement. The trial examiner in his report stated that he attached no importance to this line of testimony. The Commission agrees with the examiner and does not rely upon it in support of its findings. Such being the situation, we likewise ignore it.

As briefly as possible, we shall attempt to state the pertinent activities of the association and its members as they relate to a price fixing agreement. The association currently receives from its members daily reports of malt sales showing the date of sale, destination of shipment, grade and quantity of malt sold, and price received F. O. B. Chicago basis. This information is compiled by the office of the association on a daily sales report and sent to members, showing the name of the seller, the date sold, the quantity and grade, and the price received, without identification of the buyer or destination of the shipment. Weekly reports are received by the association from its members showing, for the week, total malt shipped, clean barley steeped, unfilled malt orders, unfilled commitments, malt stocks on hand, total barley on hand, in process and to arrive, barley purchases for the week, orders and commitments booked, malt orders and commit-

ments cancelled and malt shipped to or for a reporting company by another maltster. This information is compiled by the office of the association on a weekly and cumulative report and sent to the members. Likewise, monthly reports of similar effect are prepared by the association and distributed to the members.

When a member of the association has offered for sale to such member's customers malt at a price different than that at which such maltster has theretofore been selling malt of a like grade, such maltster advises the office of the association, usually by wire, of such price, and thereupon the association office relays such information to the other members of the association, usually by telegram. When the price announced by a maltster for new crop malt is the first price announced for that season, such maltster advises the office of the association by telegram of the price at which he has quoted new crop malt to his customers, and this information is likewise relayed by such office by telegram to the other members of the association. Information as to the announcement by a maltster of a new price on malt is not sent to the office of the association until such maltster has actually offered malt at such new price to his customers.

Members of the association customarily hold a meeting once each month, usually in the city of Chicago. At these meetings general discussions are had as to matters of general interest to the industry. Such meetings are attended and advised by the firm of Stephenson, Jordan and Harrison, who are employed by the association for such purpose at a salary of $30,000 per annum.

The members have at all times quoted and sold malt F. O. B. point of delivery or at delivered prices, and such delivered prices for the various grades of malt from November 16, 1938 to March 17, 1941 (two years and four months) have been identical. In reporting to the association, however, such prices were reported on an F. O. B. Chicago basis or, in other words, the price at which the malt would have been sold if such sales had been made F. O. B. Chicago. This reporting price, like the delivered price, has at all times been identical and uniform for the various grades of malt sold.

When an increase in price was announced by a member, its customers were notified and given an opportunity within a certain specified time to place orders at the previous or lower price. Upon notice of an increase in price by one member, all other members immediately notified their customers of such change in price and likewise gave their customers an opportunity to purchase at the previous price within a specified time. Customers who had contracts for future delivery were uniformly protected when there was an increase in the price of malt, but performance of the contract was required when there was a decrease in the price. Prior to 1938, no cash discount was allowed by any member to any of its customers. In February, 1938, a representative of the brewers' association met with the executive committee of the association to discuss the allowance of a cash discount on the purchase of malt. Upon announcement by one of the members that it had decided to allow a cash discount of ½¢ per bushel, all the other members quoted malt to customers on the basis of the same cash discount.

Barley represents from 80 to 85% of the cost of manufacturing malt. While the cost of such barley has varied considerably, the price at which the members sold their malt remained the same. The manufacturing costs of the various members varied as much as 20 to 30%. The cost of transportation of barley from the point purchased to the members' plants was not uniform. Some barley was shipped to the processing plant by boat; in other cases it was shipped by rail. The cost of shipping by boat was less than that of shipping by rail. Likewise, the cost of transportation from the plants of various members to the consumer varied according to the location of the latter with reference to the plant from which the malt was shipped. The difference in the cost of cleaning raw barley varied among the members from 3 to 10¢ per bushel. This cost not only varied from year to year but from month to month.

Many other circumstances are relied upon by the Commission in support of its ultimate finding that a price fixing agreement existed. Included therein are numerous extracts from petitioners' records, which we think unnecessary to relate. The president of petitioners' association testified in effect that members were expected to maintain the prices filed with the association until the latter was notified of a change. A member, when asked if he expected as-

sociation members to adhere to prices reported until notice of change was filed with the association, testified that "his experience has been pretty general that it has happened that way." The Commission also relies strongly in support of its price fixing finding on the fact that all members in announcing and reporting a price did so on a Chicago base. Malt was not sold, however, to consumers upon such base price but at a delivered price.

In this connection, the Commission found that uniformity of delivered price was achieved by the members through the use of Chicago, Illinois as a common basing point, that is, as the point from which the freight was calculated, irrespective of the fact that the malting plants of most of the members were not located in Chicago but were located at various other points in the United States and had different freight rates to given destinations. Petitioners devote considerable effort in attempting to show that they did not use a basing point price system. This follows, so it is argued, because the Chicago base is used merely in the reporting price in contrast to the selling or delivered price. This contention, so we think, is the counterpart of attempting to demolish a self created straw man. We find no occasion to discuss the basing point price system as it is generally understood or the effect which it has upon the price structure. Neither is it necessary to discuss in any detail the freight rate system employed by petitioners. The incontrovertible fact is that this freight rate system enabled them to deliver malt at any given destination at exactly the same price. We think it is immaterial what label be attached to such a system. It may be, as claimed by petitioners, that there was at no time included in the delivered price a charge for freight greater than the actual cost of transportation. The converse of that proposition, however, admittedly is not true. We mean by this that where a customer was at a disadvantage freightwise, the maltster from whom such customer purchased his product absorbed such part of the transportation cost as would enable it to make the customer a delivered price exactly the same as if the customer had been more favorably located. We think, as the Commission found, that without the use of this freight system there could have been no uniformity in the delivered prices.

Petitioners concede that "the collective activities of members of the association constituted an agreement." They deny that "such activities transcend the lawful and proper limits of permissible trade association activities." Thus the issue is narrowed to the question as to whether the admitted agreement was one which operated to restrain and suppress competition in price among petitioners. If this issue be answered in the affirmative, it follows that such agreement was unlawful. As was said in United States v. Socony-Vacuum Oil Co., Inc., et al., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129:

"Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se. * * * Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act [15 U.S.C.A. § 1]."

We are of the view that the Commission's findings that a price fixing agreement existed must be accepted. Any other conclusion would do violence to common sense and the realities of the situation. The fact that petitioners utilized a system which enabled them to deliver malt at every point of destination at exactly the same price is a persuasive circumstance in itself. Especially is this so when it is considered that petitioners' plants are located in four different states and that the barley from which the malt is manufactured is procured from eight or nine different states. Of further significance is the uniformity by which prices were increased and decreased. When a member announced an increase in price, that information was flashed by telegram to every other member and they immediately announced a like increase. When a member announced a decrease in price, such announcement was likewise flashed to all other members and they at once proceeded to announce a similar decrease. It may be true, as pointed out by petitioners, that a decrease in price by all members is necessary when such decrease is announced by any one member in order to meet competition. It certainly cannot be claimed, however, that it is necessary that all members increase their price upon announcement of an increase by one member in order to meet competition.

It is asserted by petitioners that an increase under such circumstances is neces-

sary in order that each member may secure from his regular customers contracts for their malt requirements at the same time that his competitors are taking contracts from their customers. This is on the theory, we suppose, that a customer is allowed a certain time subsequent to the announcement of an increase in price to place his order at the old price. In other words, it appears that each member must follow, and always to the same extent, an upward move in the market in order to force its own customers to enter into contracts for malt. This may be the most available excuse for the uniformity in a price increase but it is scant, if any, justification. In this connection also, it is pertinent to note that when one member announced a discount to customers, all other members announced exactly the same discount. These circumstances and others which could be mentioned, including the freight rate system without which a uniform delivered price could not have been achieved, furnish strong support for the finding that a price fixing agreement existed. In fact, it is difficult to discern how the various steps necessary to produce the result could have been taken with such meticulous care and regularity in the absence of an agreement.

Petitioners place great stress upon two propositions: (1) That the statistical plan of the association was clearly within the limits of those activities expressly approved in Maple Flooring Mfrs. Ass'n et al. v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093, and Cement Mfrs Protective Ass'n. et al. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104, and to a lesser extent perhaps in Sugar Institute, Inc., et al. v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859; and (2) the economic factors affecting the malt industry which inevitably produce substantial uniformity in the selling price of malt of like grade at any given time. It is asserted that the examiner and the Commission ignored the significant economic factors which combined caused the uniformity in price at which malt was sold. It is true that the Commission made no findings upon petitioners' theory in this respect. It does not follow, however, that such factors were ignored. It merely indicates, so we think, that the Commission, after considering all the evidence, came to the conclusion, and we think correctly, that it was more reasonable to believe that pe-

titioners' price structure resulted from an agreement rather than economic factors. Much testimony was offered in support of petitioners' theory which attributed the price structure to economic factors, including that of an outstanding economist who testified in effect that the uniformity in the selling price of malt at a particular time was consistent with and a necessary consequence of the normal functioning of competition in such an industry. We have considered all this testimony and are willing to concede that it furnishes the basis for a good argument. In view of the Commission's findings, however, which we think must be accepted, it would be futile to enter a discussion of this testimony.

Petitioners' reliance upon the Supreme Court decisions is of little benefit. It is true that in both the Maple Flooring and Cement Mfrs. cases, trade associations having many things in common with petitioners' association were held to be legal. However, in both of those cases it was pointed out not once but numerous times that there was no agreement to fix prices and in fact no uniformity of prices. In the Maple Flooring case, 268 U.S. at page 567, 45 S.Ct. at page 579, 69 L.Ed. 1093, the court stated:

"* * * that it is neither alleged nor proved that there was any agreement among the members of the association either affecting production, fixing prices, or for price maintenance."

This at once distinguishes that case from the instant one. In referring to the allegation that delivered prices were uniform, the court on the same page stated:

"* * * the evidence fails to establish such uniformity, and it was not seriously urged before this court that any substantial uniformity in price had in fact resulted from the activities of the association * * *."

Again, in referring to the findings of the District Court, the court (268 U.S. at page 576, 45 S.Ct. at page 582, 69 L.Ed. 1093) stated:

"The court found no agreement to fix prices and that in fact lower prices have usually been quoted by members than by nonmembers of the association."

The court recognized (268 U.S. at page 585, 45 S.Ct. at page 585, 69 L.Ed. 1093) that the activities of a trade association were illegal if such activities resulted in "concerted action to lessen production arbi-

trarily or to raise prices beyond the levels of production and price which would prevail if no such agreement or concerted action ensued."

In the Maple Flooring case, not only was there no allegation or proof of an agreement to fix prices but, as pointed out, there was no proof as to uniformity in the selling price. The court pointed out (268 U.S. at page 571, 45 S.Ct. at page 580, 69 L.Ed. 1093):

"The evidence, however, is undisputed that the defendants quote and sell on an f.o.b. mill basis whenever a purchaser so requests."

In the instant case we find no proof that the members refused to sell on an F.O.B. plant price. The proof is, however, that customers always purchased on a delivered price and. it is a fair inference that they could not have purchased otherwise had they so desired.

Also, the Cement case is readily distinguishable from the instant case. On page 592 of 268 U.S., on page 587 of 45 S.Ct., 69 L.Ed. 1104, the court, referring to the government, stated:

"It does not, however, charge any agreement or understanding between the defendants placing limitations on either prices or production."

Again, the court (268 U.S. at page 604, 45 S.Ct. on page 592, 69 L.Ed. 1104) stated:

"Agreements or understanding among competitors for the maintenance of uniform prices are, of course, unlawful and may be enjoined, but the government does not rely on any agreement or understanding for price maintenance."

The court (268 U.S. at page 606, 45 S. Ct. on page 592, 69 L.Ed. 1104) not only recognized that uniformity of price might be the result of agreement or understanding but that such uniformity not related to the supply and demand of a given commodity may be evidence from which concerted action of sellers to fix prices may be inferred.

It is not necessary to refer to the numerous decisions of the Supreme Court subsequent to the Maple Flooring and Cement cases wherein those cases have been distinguished. It is sufficient to note United

States v. Socony-Vacuum Oil Co., supra, 310 U.S. at page 217, 60 S.Ct. at page 841, 84 L.Ed. 1129, wherein the court, referring to those cases, stated:

"For the systems there under attack were methods of gathering and distributing information respecting business operations. It was noted in those cases that there was not present any agreement for price-fixing. * * * And since that element was lacking, the only issues were whether or not on the precise facts there presented such activities of the combinations constituted unlawful restraints of commerce."

■ Neither do we think that the Sugar Institute case is of any benefit to petitioners. True, it was a trade association but it is also true that the court with some modification sustained the decree of the lower court which had found that members of the association were engaged in a conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C.A. §§ 1-7, 15 note. Again, the Maple Flooring and Cement cases were distinguished. It is pertinent to note in connection with this case that petitioners in the instant case rely strongly upon the contention that malt is a standard product which is a contributing if not controlling factor bearing on the uniform price at which it was sold. In the Sugar Institute case, the court took cognizance of a similar contention. In response thereto, the court stated (297 U.S. at page 600, 56 S.Ct. at page 643, 80 L.Ed. 859):

"The fact that, because sugar is a standardized commodity, there is a strong tendency to uniformity of price, makes it the more important that such opportunities as may exist for fair competition should not be impaired."

So in the instant case the fact that malt is a standardized product, if such it be, with a tendency toward uniformity of price, makes it all the more important that such product be permitted to enter the channels of commerce unfettered by any restrictions which might impair such competition as otherwise exists.

Holding as we do that the findings of the Commission are substantially supported, it follows that its modified cease and desist order must be approved and enforced. It is so ordered.