**CANTERBURY LIQUORS
& PANTRY, Plaintiff,**

**and**

**Whitehall Co., Ltd., Plaintiff/Intervenor,**

**v.**

**Walter J. SULLIVAN, Jr.,
et al., Defendants,**

**and**

**Massachusetts Wholesalers Of Malt Beverages, Inc., Defendant/Intervenor.**

**C.A. No. 94–11701–MLW.**

United States District Court,
D. Massachusetts.

Feb. 3, 1998.

a vehicle after his license was suspended.

Alan L. Kovacs, Gerald J. Caruso, Ferriter, Scobbo, Sikora, Caruso & Rodophele, Boston, MA, for Canterbury Liquors & Pantry.

Robert M. Buchanan, Jr., Robert S. Frank, Jr., Joshua Engel, Choate, Hall & Stewart, Boston, MA, for Whitehall, Co., Ltd.

Jane L. Willoughby, Attorney General's Office, Boston, MA, for Stuart P. Krusell, Pamela M. Nourse and Massachusetts Alcoholic Beverages Control Commission.

Thomas Fenerty, Eileen M. Fava, H. Glenn Alberich, LeBoeuf, Lamb, Greene & McRae, Boston, MA, for Massachusetts Wholesalers of Malt Beverages.

## ORDER

WOLF, District Judge.

The following analysis is based upon the transcript of the decision rendered orally on January 27, 1998, granting plaintiffs' motions for summary judgment (Docket Nos. 158 & 166) and denying defendants' motions for summary judgment (Docket Nos. 162 & 169). This memorandum adds citations, revises and amplifies some of the discussion, and deletes certain non-essential matters.

The transcripts of the hearings on January 26 and 27, 1998, are being prepared and may be acquired from the court reporter.

\*     \*     \*     \*     \*     \*

The present plaintiffs in this case are Sea Shore Corporation, which does business as Canterbury Liquors and Pantry a licensed retailer of alcoholic beverages,[1] and an intervenor as plaintiff, Whitehall Company Limited, a licensed wholesaler of alcoholic

---

1. The other original plaintiffs were Luke Brothers, Inc.; Cape Cod Package Store, Inc.; Andy's Market, Inc.; and Yankee Spirits, Inc. They voluntarily dismissed their claims in 1995.

beverages[2] (collectively, the "plaintiffs"). The defendants are the Chairman and Commissioners of the Massachusetts Alcoholic Beverages and Control Commission ("the Commission"), sued in their official capacities,[3] and a defendant-intervenor, Massachusetts Wholesalers of Malt Beverages, Inc. ("MWMBI"), a trade association whose members are engaged primarily in the wholesale sale of beer[4] (collectively, the "defendants").

The plaintiffs brought this action seeking declaratory and injunctive relief. Count I seeks a declaration that M.G.L. c. 138, § 25A, which relates to the pricing of wholesale liquor, violates § 1 of the Sherman Act both on its face and as applied, and that it is not shielded from invalidation by the immunity doctrine enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Count I also seeks an order permanently enjoining the Commission from enforcing the state statute. *See* Verified Complaint at 7–9, ¶¶ 25–30.

Count II seeks the same declaratory and injunctive relief with respect to the regulations promulgated by the Commission to implement § 25A. 204 C.M.R. §§ 6.00–6.07. *See* Verified Complaint at 9–11, ¶¶ 31–36.

The plaintiffs' fundamental contention is that the Massachusetts regulatory scheme concerning the pricing of wholesale liquor violates § 1 of the Sherman Act. Section 1 states, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is illegal." 15 U.S.C. § 1. The Supreme Court has explained that:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress ... [T]he policy unequivocally laid down by the Act is competition.

*Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

The Supreme Court has held that some conduct constitutes a *per se* violation of § 1. *Id.* at 5. All other conduct is subject to a rule of reason test. *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 8, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

With regard to the procedural history of this matter, which began in 1994, the parties engaged in the limited discovery relevant to the alleged *per se* violation of § 1. The parties filed cross-motions for summary judgment on this issue. The parties agreed at the hearing on January 26, 1998, that this issue can be decided on the cross-motions for summary judgment.

More specifically, the defendants assert that there are no material facts in dispute. The plaintiffs contend that the question of whether the state actually monitors its regulatory scheme is not undisputed, but that this factual question is not material. As I will describe later, I agree that this issue is not material. Thus, the issues relating to the alleged *per se* violation can and should be decided on the cross-motions for summary judgement.

At the inception of this case I referred it to the Magistrate Judge. The Magistrate Judge heard argument on the cross-motions for summary judgment in December, 1996. He issued a Report and Recommendation on June 27, 1997 (the "Report"). He recommended that summary judgment be entered for the defendants. The plaintiffs filed objections to the Report. The defendants responded. I held a hearing on January 26,

---

**2.** In February, 1996, Whitehall was granted leave to intervene as a plaintiff. Whitehall filed a complaint in intervention which mirrored the original plaintiffs' complaint.

**3.** At the time suit was brought, the Chairman was Stuart P. Krusell and the sole Commissioner was Pamela M. Nourse. The present Chairman

is Walter J. Sullivan, Jr., and the other two members of the Commission are Suzanne Iannella, who replaced Nourse, and Frederick W. Riley. By operation of Fed.R.Civ.P. 25(d)(1), they are, in their official capacities, the defendants.

**4.** In September, 1994, MWMBI was granted leave to intervene as defendant-intervenor.

1998, on the issues relating to the alleged *per se* violation of § 1. If the plaintiffs do not prevail on their claims of a *per se* violation, discovery and further litigation will be necessary with regard to their rule of reason claim.

The Magistrate Judge's Report and Recommendation is instructive. However, as a matter of law, this court is required to decide *de novo* the portions of the Report placed in dispute by the objections. 28 U.S.C. § 636(b)(1)(C). *See also* Fed.R.Civ.P. 72(b); Local Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts.

As these are motions for summary judgment, I am, with regard to each motion, required to look at the record in the light most favorable to the opposing party, *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994), and to decide if any material fact is genuinely placed in dispute by the admissible evidence. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). I agree with the parties that the evidence does not place any material fact genuinely in dispute. Thus, as I said, it is necessary and appropriate to decide now who is entitled to prevail as a matter of law.

I have decided that the plaintiffs are entitled to prevail on their motion for summary judgment. I reach this conclusion essentially for the reasons stated by the Ninth Circuit in addressing a similar regulatory scheme in *Miller v. Hedlund*, 813 F.2d 1344 (9th Cir. 1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988). Comparable analysis was done by Judge Ralph Winter in his dissent concerning the virtually identical regulatory scheme involved in *Battipaglia v. New York State Liquor Auth.*, 745 F.2d 166, 179 (2d Cir.1984)(Winter, J., dissenting), *cert. denied*, 470 U.S. 1027, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). The Ninth Circuit and Judge Winter essentially implement the analysis previously done by Professor Phillip Areeda and his colleagues in their treatise on antitrust law; the reasoning of the Ninth Circuit and Judge Winter has been endorsed in the most recent edition of that treatise. 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 217, at 310–12 (1997).[5]

The statute now at issue, M.G.L. c. 138, § 25A, provides in pertinent part that:

> No licensee authorized under this chapter to sell alcoholic beverages to wholesalers or retailers shall—
>
> (a) Discriminate, directly or indirectly, in price, . . . between one wholesaler and another wholesaler, or between one retailer and another retailer purchasing alcoholic beverages bearing the same brand or trade name and of like age and quality.

And then, in a further paragraph, it states:

> All price lists or price quotations made to a licensee by a wholesaler shall remain in effect for at least thirty days after the establishment of such price list or quotation. Any sale by a wholesaler of any alcoholic beverages at prices lower than the price reflected in such price list or quotation within such thirty day period shall constitute price discrimination under this section.

The plaintiffs do not challenge the broad prohibition against price discrimination contained in the first quoted paragraph, subsection (a). Rather, they challenge only the provisions of the second quoted paragraph.

The related, relevant regulations require each wholesaler by the fifth day of each month to post the prices that it will charge during the next following month for each item that the wholesaler sells. 204 C.M.R. § 6.03(3). The regulations permit the whole-

---

**5.** The majority in *Battipaglia* expressly recognized that its suggestion, but not holding, that the regulatory scheme at issue might enjoy state action immunity if it otherwise constituted a *per se* violation of § 1 was contrary to the conclusion reached by "the most influential treatise on the subject, Areeda & Turner, 1 *Antitrust Law* ¶ 213d, at 75 (1978)." 745 F.2d at 176. Professor Areeda and his colleagues subsequently considered the observations made by the majority in *Batti-*

*paglia* and were unpersuaded, both on the issue of whether the New York regulatory scheme involved a *per se* violation of § 1 and whether there was state action immunity. *See* Areeda & Hovenkamp, *supra*, ¶ 217, at 311. Professors Areeda and Hovenkamp also found the Ninth Circuit's decision in *Miller, supra*, to apply properly the approach employed by the Supreme Court in *Midcal*. *Id.* at 311–12.

saler by the fifteenth day of the month to amend its posted prices, but only to meet a specific lower price or a specific greater discount for an individual item filed by a competitor. 204 C.M.R. § 6.05(1). In other words, a wholesaler may not increase its previously posted price or decrease its price to any price other than the exact lower price for the same product that was posted by a rival wholesaler. The prices, as amended, become effective on the first day of the following month and they must remain unchanged throughout that calender month. 204 C.M.R. § 6.03(3). Plaintiffs challenge the validity of these regulations.

In the federal system of government established by our Constitution, the laws of the United States are the "supreme Law of the Land," U.S. Const. Art. VI, and thus preempt and invalidate inconsistent state laws in certain circumstances. *See, e.g., Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 210–11, 6 L.Ed. 23 (1824). The standard for determining whether the statute and regulations now at issue are preempted by § 1 of the Sherman Act is set forth in the Supreme Court's decision in *Rice v. Norman Williams Co.,* 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982). The Supreme Court in *Rice* said:

> [A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under § 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a *per se* violation. If the activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract. Analysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws.

458 U.S. at 661, 102 S.Ct. 3294. As I said earlier, at this point the motions for summary judgment address only the plaintiffs' claim of a *per se* violation of § 1 and, therefore, the Supreme Court's formulation of the issue in the *Rice* case applies here.

The analysis involved in deciding the cross-motions for summary judgment requires two steps. First, I must determine whether the Massachusetts regulatory scheme violates § 1 under the *Rice* test. If so, second, I must determine whether the state has and exercises sufficient power to prevent anticompetitive conduct to provide that regulatory scheme antitrust immunity as state action pursuant to the Supreme Court's decision in *Parker, supra.*

Each of these two steps also has two parts to the analysis. With regard to a possible *per se* violation of § 1, I must in this case first decide if the restraint on trade at issue is what the Supreme Court has called a "unilateral restraint" or a "hybrid restraint." *Fisher v. City of Berkeley,* 475 U.S. 260, 267–68, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). Second, if it is a "hybrid restraint," I must decide if it involves a *per se* violation of § 1.

With regard to possible immunity, I must decide, first, whether there is a clearly articulated and affirmatively expressed state policy that the restraint at issue is intended to serve. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)(citing *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)). If so, second, I must decide whether that policy is actively supervised by the state itself. *Id.*

As I will soon describe, I find that this case involves a "hybrid restraint." Furthermore, I find that the requirements that prices be announced, not be changed except to meet a competitor's lower announced price, and be maintained for a month effect a *per se* violation of § 1.

In addition, I find that there is no state action immunity for this regulatory scheme because, while Massachusetts has a clearly articulated policy concerning what the restraint on trade is intended to serve, the

state does not have the power to attempt to assure that the resulting prices are reasonable. Rather, the Commission merely enforces a *per se* violation of § 1, and this conduct is insufficient to generate state action immunity. The reasons for these conclusions are as follows.

■ First, as I said, the Massachusetts regulatory scheme creates a "hybrid restraint" as defined by the Supreme Court in its 1986 decision in *Fisher*. In *Fisher*, the Supreme Court found a city rent control ordinance was not preempted by § 1 because the city unilaterally established the maximum rents that could be charged in Berkeley, California. 475 U.S. at 267, 106 S.Ct. 1045. The Supreme Court went on to say, however:

> Not all restraints imposed upon private actors by government units necessarily constitute unilateral action outside the purview of § 1. Certain restraints may be characterized as "hybrid," in that non-market mechanisms merely enforce private marketing decisions. *See Rice v. Norman Williams Co.*, 458 U.S. at 665, 102 S.Ct. 3294 (Stevens, J., concurring in judgment). Where private actors are thus granted "a degree of private regulatory power," *id.* 458 U.S. at 666 n. 1, 102 S.Ct. 3294 the regulatory scheme may be attacked under § 1.

475 U.S. at 267–68, 106 S.Ct. 1045.

The Supreme Court has characterized its decisions in *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), *Midcal, supra,* and *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987), as involving "hybrid restraints." Each of those cases involved the liquor industry and some form of retail price maintenance. *Schwegmann*, 341 U.S. at 386, 71 S.Ct. 745; *Midcal*, 445 U.S. at 103, 100 S.Ct. 937; *Duffy*, 479 U.S. at 341, 107 S.Ct. 720. All involved the state authorizing price setting and enforcing the price established by private parties. *Schwegmann*, 341 U.S. at 387, 71 S.Ct. 745; *Midcal*,

445 U.S. at 105, 100 S.Ct. 937; *Duffy*, 479 U.S. at 341, 107 S.Ct. 720.

In its 1987 decision in *Miller*, after examining *Schwegmann* and *Midcal*, the Ninth Circuit characterized a regulatory scheme relating to wholesale liquor prices that was comparable to the scheme at issue in the instant case as a "hybrid restraint" because it allowed private parties to set prices and the state did not review the reasonableness of them; rather, the regulatory scheme merely enforced private pricing decisions. 813 F.2d at 1350–51. Implicit in the *Miller* decision is the understanding that there may be a "hybrid restraint" concerning wholesale liquor prices as well as concerning retail liquor prices. I agree and, essentially for the reasons stated by the Ninth Circuit, find that this case involves a "hybrid restraint." *Id.* at 1351.[6]

■ In addition, I find that the Massachusetts regulatory scheme effects a *per se* violation of § 1. It is important to recognize, however, that a "hybrid restraint" does not necessarily involve any violation of § 1, let alone a *per se* violation. It depends upon the particular facts of the case. *Hertz Corp. v. City of New York*, 1 F.3d 121, 129 (2d Cir. 1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054 (1994).

The Supreme Court has defined a *per se* violation most notably in *Northern Pacific Ry. Co.*, 356 U.S. at 5, 78 S.Ct. 514 stating that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." These agreements or practices are deemed unlawful *per se* "without further examination under the rule of reason generally applied in Sherman Act cases." *Broadcast Music, Inc.*, 441 U.S. at 8, 99 S.Ct. 1551.

The Ninth Circuit in *Miller* and Judge Winter in his dissent in *Battipaglia* deemed the regulatory schemes at issue in each of

---

**6.** The Second Circuit decided *Battipaglia* in 1984, two years before the Supreme Court's decision in *Fisher*. Thus, the Second Circuit did not analyze whether the New York regulatory scheme at issue created a "hybrid restraint."

those cases to be a *per se* violation of § 1. They relied on statements of the Supreme Court in reaching their respective conclusions. I am persuaded by the reasoning and statements of the Supreme Court to concur with the Ninth Circuit and Judge Winter in this case.

■ Contrary to plaintiffs' contention, however, I do not find that merely exchanging price information, as the Massachusetts regulatory scheme in effect requires, is a *per se* violation, despite certain language in *United States v. Container Corp.*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). There, the Supreme Court ruled that the result of a "reciprocal exchange of prices was to stabilize prices though at a downward level." 393 U.S. at 336, 89 S.Ct. 510. The Court held that "[t]he limitation or reduction of price competition" resulting in this stabilization in prices "brings the case within the ban [of the Sherman Act], for . . . interference with the setting of price by free market forces is unlawful *per se*." 393 U.S. at 337, 89 S.Ct. 510 (citation omitted). Justice Fortas, however, wrote in a concurrence to *Container Corp.* that, "I do not understand the Court's opinion to hold that the exchange of specific information among sellers as to prices charged to individual customers, pursuant to mutual arrangement, is a *per se* violation of the Sherman Act." *Id.* 393 U.S. at 338–39, 89 S.Ct. 510 (Fortas, J., concurring). The Supreme Court has at least twice cited with approval this concurrence in stating that the mere exchange of price data is not a *per se* violation of § 1. *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *United States v. Citizens and Southern Nat'l Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

■ However, the Supreme Court has also stated that where, as here, announced prices are coupled with a requirement that those prices be adhered to for a period of time, a *per se* violation of § 1 exists. More specifically, in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980)(*per curiam* ), the Supreme Court held an agreement among competing wholesalers not to sell on credit to be a form of price

fixing that constituted a *per se* violation of § 1. In doing so, the Supreme Court said:

> [W]e have held agreements to be unlawful *per se* that had substantially less direct impact on price than the agreements alleged in this case. For example, in *Sugar Institute v. United States*, 297 U.S. 553, 601–02, 56 S.Ct. 629, 80 L.Ed. 859 (1936), the Court held unlawful an agreement to adhere to previously announced prices and terms of sale, even though advance price announcements are perfectly lawful and even though the particular prices and terms were not themselves fixed by private agreement.

*Id.* 446 U.S. at 647, 100 S.Ct. 1925.

I recognize, as the Magistrate Judge pointed out, that the *Sugar Institute* case was decided after a non-jury trial and was based on detailed findings of fact, 297 U.S. at 571, 56 S.Ct. 629; the Supreme Court's decision in 1936 did not characterize the violation being found as a *per se* violation; and the statement in *Catalano* is dictum. Report at 42. However, as the First Circuit said in *McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992), "federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement." *See also United States v. Santana*, 6 F.3d 1, 9 (1st Cir.1993). This principle applies equally to federal district courts.

In the instant case, the Supreme Court's characterization in *Catalano* of an agreement to adhere to a previously announced price as a *per se* violation of § 1 is relatively recent. It appears to have been considered. Indeed, it was highly relevant to the Supreme Court's analysis in *Catalano*. Moreover, it has not been qualified by any subsequent statements by the Supreme Court to this court's knowledge.

In addition, the Supreme Court's characterization of an agreement to adhere to previously announced prices as a *per se* violation of § 1 makes sense when the purposes of the Sherman Act are considered. As indicated

earlier, the "Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Thus, as the Supreme Court noted in *Catalano*, 446 U.S. at 647, 100 S.Ct. 1925, an agreement among competing firms of professional engineers to refuse to discuss prices with potential customers until an engineer had been initially selected, while "not price fixing as such," constituted a *per se* violation of § 1 because no elaborate industry analysis was required to demonstrate that a ban on competitive bidding was anticompetitive. *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, 98 S.Ct. 1355. Similarly, in the instant case, no elaborate inquiry is needed to demonstrate that the Massachusetts regulatory scheme for pricing wholesale liquor is anticompetitive because it plainly precludes individual retailers from seeking to negotiate more favorable prices from competing wholesalers.

Thus, like the Ninth Circuit and Judge Winter in *Battipaglia*, I am guided if not governed by the Supreme Court's statements and reasoning in *Catalano*, and find that this case too involves a *per se* violation of § 1. *See also* Areeda & Hovenkamp, *supra*, ¶ 217, at 311 ("Given the great danger that agreements to post and adhere will facilitate horizontal collusion, the dissent's position [in *Battipaglia* ] is more consistent with *Midcal*.").[7]

The fact that a *per se* violation of § 1 has been demonstrated is not the end of the inquiry, however. As indicated earlier, a state may immunize an otherwise impermissible violation of § 1 if its regulatory scheme meets certain standards. However, as also indicated earlier, in this case those standards are not met.

■ To reiterate, the Supreme Court's decision in *Midcal* establishes the two-part test for determining whether immunity exists. 445 U.S. at 105, 100 S.Ct. 937. The Magistrate Judge found with regard to the first prong that the challenged restraint was clearly articulated and affirmatively expressed as state policy. Report at 33. No objection has been taken to this finding. The parties do not dispute that this prong of the test is satisfied. I agree that the statute and regulations meet this requirement.

*Midcal* also requires, however, that the policy at issue be actively supervised by the state itself. 445 U.S. at 105, 100 S.Ct. 937. The defendants claim that the Commission monitors to assure that the regulatory scheme it administers is being followed by wholesalers and that enforcement action is sometimes taken in appropriate circumstances to prevent wholesale price discrimination. They assert, in part, that this is all that is required.

In *Battipaglia*, the majority, in dictum, stated that it felt there was "some force" to this argument. 745 F.2d at 176. The majority also recognized, however, that Professors Areeda and Turner in their treatise rejected this contention. *Id.* (citing Areeda & Turner, 1 *Antitrust Law* ¶ 213d, at 75 (1978)). The Second Circuit did not decide this issue in *Battipaglia* because it was unnecessary in that case to do so. *Id.*

As indicated earlier, the plaintiffs state that, if it were material, they would seek more discovery and a trial to determine whether the state even actively enforces the regulatory scheme now being challenged.

---

7. The fact that the regulatory scheme at issue effects a *per se* violation of § 1 renders immaterial any dispute that may be created by competing affidavits in this case concerning whether the ability to amend a posted price downward in certain circumstances is anticompetitive or procompetitive. *Compare* Statement of Phoebe Morse, Director of the Boston Regional Office of the Federal Trade Commission, Appendix to Whitehall's Motion for Summary Judgment, Exh. C, *and* Statement and Affidavits of Daniel S. Levy, Memorandum in Support of MWMBI's Motion for Summary Judgment, Exh. C, D; Opposition of MWMBI to Plaintiff's Motions for Summary Judgment, Exh. B. It is this type of complicated economic analysis that a *per se* rule moots. *Northern Pacific Ry. Co.*, 356 U.S. at 5, 78 S.Ct. 514 ("This principle of *per se* unreasonableness ... avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.").

They assert, however, that this issue is immaterial because actively supervising, and thus assuring, a *per se* violation of § 1 of the Sherman Act is not sufficient to create state action immunity. I agree. As the Supreme Court has written, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker*, 317 U.S. at 351, 63 S.Ct. 307. *See also* Areeda & Hovenkamp, *supra*, ¶ 226, at 470 ("[T]he state itself might wish simply to yield discretion to private firms to break the antitrust laws when and how they please, but this is the place where federal antitrust policy draws the line.").

In essence, I find this case to be in material respects analogous to the Supreme Court's decisions in *Midcal* and *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), and closely comparable to the Ninth Circuit's decision in *Miller*.

*Midcal* involved a regulatory scheme that had the effect of permitting private parties to set retail prices of wine in California. 445 U.S. at 97, 100 S.Ct. 937. The Supreme Court held that the California program was not actively supervised, and therefore was not protected by state action immunity, because:

> The State simply authorizes price setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any "pointed reexamination" of the program.

445 U.S. at 105–06, 100 S.Ct. 937. *See also Duffy*, 479 U.S. at 344–45, 107 S.Ct. 720. In *Midcal*, the Supreme Court held that: "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U.S. at 106, 100 S.Ct. 937. The fatal flaw in *Midcal* was not the private price fixing, but the failure of state officials to set or regulate the prices resulting from California's regulatory scheme. *See* Areeda & Hovenkamp, *supra*, ¶ 217, at 308.

In *Miller*, the Ninth Circuit held that the Oregon law at issue also did not involve sufficiently active supervision to generate immunity because:

> "Oregon mandates the posting of prices to be charged by each wholesaler, but does not in any way review the reasonableness of the prices set. While the Commission 'may reject any price posting which is in violation of any of its rules,' the effect of that rule is simply to effectuate the price posting. . . . It does not provide for government establishment or review of the prices themselves. . . . Oregon merely authorizes and enforces the disputed pricing practices."

813 F.2d at 1351 (quoting *Miller v. Oregon Liquor Control Comm'n*, 688 F.2d 1222, 1226–27 (9th Cir.1982)).

*Miller* was decided in 1987. The Supreme Court's 1992 decision in *Ticor* reenforces the validity of the view expressed by the Ninth Circuit in that case. In *Ticor* the Supreme Court held that state regulators had not sufficiently supervised the uniform prices established by title insurers through rate bureaus to provide state action immunity under *Parker*. *Ticor*, 504 U.S. at 639–40, 112 S.Ct. 2169. In doing so, the Supreme Court made several statements that I find particularly meaningful here.

First, it said that:

> *Midcal* confirms that while a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details. *Actual state involvement, not deference to private price-fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law.*

*Id.* 504 U.S. at 633, 112 S.Ct. 2169 (emphasis added). The Supreme Court explained this point further, stating that the purpose of the active supervision inquiry:

> is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a prod-

uct of deliberate state intervention, not simply by agreement among private parties.... The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.

*Id.* 504 U.S. at 634–35, 112 S.Ct. 2169.

In addition, the Supreme Court explained that for this standard to be met, the state must both have and exercise the power to review and revise the pricing decisions made by private parties. More specifically, it stated:

"[T]he active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct.... The mere presence of some state involvement or monitoring does not suffice.... The active supervision prong of the *Midcal* test requires that state officials *have and exercise* power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy."

*Id.* 504 U.S. at 634, 112 S.Ct. 2169 (quoting *Patrick v. Burget*, 486 U.S. 94, 101, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988))(emphasis added). *See also New England Motor Rate Bureau, Inc. v. FTC*, 908 F.2d 1064, 1070 (1st Cir.1990).

This means, in part, that:

For States which ... choose to displace the free market with regulation, [the Supreme Court's] insistence on real compliance with both parts of the *Midcal* test [authorization and supervision] will serve to make clear that the State is responsible for the price fixing it has sanctioned and undertaken to control.

*Id.* 504 U.S. at 636, 112 S.Ct. 2169. Thus, to generate immunity, it is not sufficient for a state, like Massachusetts, to articulate clearly a public policy reason—in this case the goal of preventing price discrimination in the wholesale sale of liquor—for authorizing a form of price fixing. It must also have and exercise the power to assure that the resulting prices are reasonable.

The reason for this requirement emerges from *Ticor*. There, the Supreme Court indicated that it had been, and would be, "adhering in most cases to fundamental and accepted assumptions about the benefits of competition within the framework of the antitrust laws." *Id.* 504 U.S. at 636, 112 S.Ct. 2169. As described previously, the Sherman Act is aimed at preserving free competition in order to, among other things, assure the lowest prices for the highest quality of goods. *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 695, 98 S.Ct. 1355; *Northern Pacific Ry Co.*, 356 U.S. at 4, 78 S.Ct. 514. A state may establish a regulatory scheme to displace free competition in order to serve some other, clearly stated public policy. If it does so, however, it must provide as part of that regulatory scheme state power to assure that the resulting prices are reasonable because the free market can no longer be relied upon to do so. Ideally in a democracy, if a state has this power and responsibility, competing economic interests should operate to cause the state to assure that the prices established through its regulatory scheme are reasonable. In *Ticor*, however, the Supreme Court expressed its unwillingness to rely on the functioning of the democratic process alone. Rather, it instructed courts to determine whether states which in effect authorize a form of price fixing both have the power to prevent abuses and also exercise that power. 504 U.S. at 637–38, 112 S.Ct. 2169.

These principles as applied in the present case demonstrate that the *per se* violation of § 1 of the Sherman Act generated by M.G.L. c. 138, § 25A and the related regulations is not protected by state action immunity. As described earlier, the system of announced prices coupled with a requirement that those prices be adhered to for a period of time constitutes a form of price fixing that ordinarily constitutes an impermissible *per se* violation of § 1. *Catalano*, 446 U.S. at 643, 100 S.Ct. 1925; *Miller*, 813 F.2d at 1349. State action immunity for such anticompetitive conduct exists only if Massachusetts both has and exercises the power to assure that the prices privately set for wholesale liquor are reasonable.

Under Massachusetts law, however, the Commission does not have the statutory authority to review or revise wholesale liquor prices. More specifically, neither M.G.L. c.

138, § 25A, the related regulations, nor any other statute or regulation gives the Commission this power. This contrasts, for example, with M.G.L. c. 138, § 25C, which requires the filing of minimum consumer prices for alcoholic beverages, and Commission approval as "not being excessive, inadequate or unfairly discriminatory" before those consumer prices can go into effect.

If the state in this case had the power to assure that its regulatory system generated reasonable wholesale liquor prices, it would also be necessary to decide whether it actually exercises that power. As the Commission lacks such power, this issue is not material.[8]

In view of the foregoing, the plaintiffs are entitled to summary judgment on their request for a judgment declaring that the pertinent portion of M.G.L. c. 138, § 25A and the implementing regulations are preempted by § 1 of the Sherman Act and, therefore, are invalid. It is not clear, however, whether it will be necessary or appropriate to issue the injunctive relief plaintiffs seek. "At the conclusion of a successful federal challenge to a state statute or local ordinance, a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). Thus, unless the Commonwealth of Massachusetts states that it does not intend to comply with the declaratory judgment which will be issued, the court perceives no imminent threat of irreparable harm and, therefore, no need to issue an injunction. *See South Boston Allied War Veterans Council v. City of Boston*, 875 F.Supp. 891, 920 (D.Mass.1995)(entering declaratory judgment, but not injunction, con-

cerning decision that City could not condition issuance of a permit for St. Patrick's Day Parade on the inclusion of a gay and lesbian group because City intended to comply with the declaratory judgment).

If either the Commonwealth or the defendant-intervenor Massachusetts Wholesalers of Malt Beverages, Inc. wishes to appeal this decision and requests a stay pending appeal, I will decide whether a stay is justified. *See, e.g., Exxon Corp. v. Esso Worker's Union, Inc.*, 963 F.Supp. 58 (D.Mass.1997).

Accordingly, it is hereby ORDERED that:

1. The Attorney General shall by February 17, 1998, inform the court:

(a) Whether the Chairman and Commissioners of the Alcoholic Beverages and Control Commission intend to comply voluntarily with the declaratory judgment to be entered or whether it will be necessary for the court to enter the requested injunction;

(b) Whether the Chairman and Commissioners of the Alcoholic Beverages and Control Commission intend to appeal; and, if so

(c) Whether they seek a stay of this court's Order pending appeal.

2. Defendant–Intervenor Massachusetts Wholesalers of Malt Beverages, Inc. shall, by February 17, 1998, inform the court whether it intends to appeal and, if so, whether it seeks a stay of this court's Order pending appeal.

3. If either defendant moves for a stay pending appeal, it shall, by February 24, 1998, file a supporting memorandum and affidavit(s).

---

8. However, since the parties have agreed that the record is complete concerning this issue and that it can be resolved on summary judgment, in the interest of completeness I note that there is little evidence that the Commission exercises any conceivable power it might have to try to assure the reasonableness of prices for wholesale liquor.

Mr. Krusell, a former Commissioner, gave some testimony with regard to his activities in considering the reasonableness of prices. Memorandum in Support of MWMBI's Motion for Summary Judgment, Exh. F (Stuart Krusell Deposition Transcript), at 2:84, 3:58–59. There is considerably more evidence indicating that the

Commission does not actively seek to evaluate or assure the reasonableness of prices. For example, there is no document in the record showing that the Commission ever reviewed, let alone approved, the reasonableness of a wholesale liquor price. The depositions of Commission employees Robert Temple and Peter Connelly are consistent with the conclusion that the Commission did not do this. Appendix to Whitehall's Opposition, Exh. 5 (Robert Temple Deposition Transcript), at 34, 90–91; Appendix to Whitehall's Opposition, Exh. 4 (Peter Connelly Deposition Transcript), at 41–44, 48–50.

4. If plaintiffs wish to oppose any requested stay, they shall, by March 2, 1998, file their memorandum and affidavit(s).

5. If necessary, a further hearing will be held on March 10, 1998, at 3:00 p.m.