GANTS, C.J.
**683 Under 204 Code Mass. Regs. § 2.04(1) (1993), a regulation promulgated by the alcoholic beverages control commission (commission), a licensed retailer of alcoholic beverages shall not "sell or offer to sell any alcoholic beverages at a price less than invoiced cost," with "[c]ost ... defined as net cost **684 appearing on the invoice for said alcoholic beverage."[2] Here, the licensed retailer at issue, Massachusetts Fine Wines & Spirits, LLC, doing business as Total Wine & More (Total Wine), sold bottles of liquor and wine at prices that were below the cost listed on the invoices for its purchase of those bottles from the wholesaler. For this reason, the commission found Total Wine in violation of § 2.04(1). Total Wine contends that it was not in violation of this regulation because, after accounting for the "cumulative quantity discounts" (CQDs) that it obtained from its bulk purchases of these brands of liquor and wine -- which were credited in subsequent invoices -- its ultimate net cost per bottle was below its sales price to consumers.
We conclude that the plain language of § 2.04(1) requires that the net cost of liquor or wine sold to a licensed retailer, including any credits applied to that sale from CQDs, be reflected in the invoice for that particular sale, and that it was reasonable for the commission to interpret the regulation in accordance with the regulation's plain language. We also conclude that the commission's interpretation of this regulation is reasonable in light of both its legislative mandate and the administrative demands of efficient and uniform enforcement. Where Total Wine sold liquor and *973 wine purchased through the invoiced sales in the record at prices below the net price reflected in those invoices, the commission was justified in finding that Total Wine sold the liquor or wine "at a price less than invoiced cost," in violation of § 2.04(1). Accordingly, we reverse the Superior Court judgment allowing Total Wine's motion for judgment on the pleadings, and remand the case to the Superior Court with instructions to allow the commission's cross motion for judgment on the pleadings and to enter judgment in favor of the commission.[3]
Background. We summarize the facts as found by the commission, which we conclude are supported by substantial evidence. See Craft Beer Guild, LLC v. Alcoholic Beverages Control Comm'n, 481 Mass. 506, 509, 117 N.E.3d 676 (2019) ( Craft ), citing **685 G. L. c. 30A, § 14 (7) (e ).
Total Wine is a retailer of alcoholic beverages licensed by the commission pursuant to G. L. c. 138, § 15, the statutory provision of the Liquor Control Act authorizing liquor stores to sell alcoholic beverages to be consumed off premises. Craft, supra at 509 n.4, 117 N.E.3d 676. In December 2015, the commission received numerous complaints that at least one Total Wine retail store was selling alcoholic beverages to consumers at prices below the invoiced cost to Total Wine, in violation of 204 Code Mass. Regs. § 2.04(1). The commission continued to receive complaints about Total Wine's pricing practices regarding at least two retail store locations in May and June of 2016. Pursuant to its authority to undertake "general supervision of the conduct of the business of ... selling alcoholic beverages," G. L. c. 10, § 71, and to "enforc[e] and prevent[ ] violation of" its own regulations, G. L. c. 138, § 24, the commission initiated investigations into Total Wine's pricing practices.
When the commission's investigators obtained invoices from the licensed wholesalers from whom Total Wine purchased its liquor, they discovered that, with respect to at least four brands of liquor and wine sold during November 2015, and at least eight brands of liquor sold during May and June 2016, Total Wine sold bottles to consumers at a price below its own invoiced per-bottle cost. For example, as to one brand of rum, Total Wine purchased cases from a wholesaler at an original cost of $19.99 per bottle. The invoice reflected a one percent "prompt payment" discount, because Total Wine paid for the rum upon delivery, which reduced the cost to $19.79 per bottle. Yet Total Wine sold this brand of rum in two stores at a retail price of $17.99 per bottle.
The wholesalers that sold these brands to Total Wine, however, offered CQDs under various promotional programs to retailers who purchased these brands in certain quantities during certain limited periods of time. For instance, with respect to the brand of rum in the example referenced supra, Total Wine earned a credit of two dollars per bottle once it purchased 225 cases of the rum, which it could apply to future purchases and which was later reflected in a new credit invoice. Although Total Wine paid the wholesaler $19.79 per bottle upon delivery, Total Wine knew that it would receive the two dollars per bottle credit from the CQD because of the amount it had purchased, and therefore factored this future credit in pricing the rum at $17.99 per bottle, which was twenty cents above what it considered to be its true "net cost"
**686 of $17.79. The CQDs were *974 generally discussed between Total Wine and its wholesalers over electronic mail (e-mail) correspondence, and at least some CQDs were publicly advertised to retailers in the Massachusetts Beverage Journal.[4] But the credits arising from CQDs were never reflected on the original invoices at the time that the liquor or wine was purchased; they were reflected only on subsequent credit invoices and applied to future purchases.
After evidentiary hearings, the commission issued written decisions on January 18, 2017, finding Total Wine in violation of 204 Code Mass. Regs. § 2.04(1) for selling alcoholic beverages at two Total Wine stores at retail prices that were below the net cost appearing on the invoices. The commission concluded that under the plain language of the regulation, which provides that "[c]ost is defined as net cost appearing on the invoice for said alcoholic beverage," it could not factor in the CQDs -- which appeared on separate invoices that were issued later in time -- to Total Wine's net cost. The commission did not dispute that, if the future credits from the CQDs were factored into the cost of the products, the over-all cost to Total Wine would fall below the prices that were being offered to consumers. But it nevertheless concluded that any such discounts must appear on the original invoice to be considered in the calculation of net cost under § 2.04(1). The commission thus ordered that Total Wine's license to sell alcoholic beverages at its Everett location be suspended for eight days, with two days to be served; that its license for its Natick location be suspended for eleven days, with three days to be served; and that the remaining balances be held in abeyance for two years conditioned on no further violations of G. L. c. 138 or commission regulations.
Total Wine sought judicial review of the commission's decision in the Superior Court pursuant to G. L. c. 30A, § 14. After the parties filed cross motions for judgment on the pleadings, the Superior Court judge granted Total Wine's motion and denied the commission's motion. The judge concluded that "the [c]ommission has interpreted the definition of 'invoiced cost' in a manner that is inconsistent with well-established principles of statutory construction." The judge declared that, by failing to account for the CQDs in calculating the actual cost of goods to Total Wine, **687 the commission "disregard[ed] ... the substantive realities of transactions between alcoholic beverage wholesalers and their retail merchants." The judge also concluded that the commission's "inflexibl[e]" interpretation of § 2.04(1) bore "no rational connection to the purpose of its governing statutory scheme" -- which, the judge concluded, was "to prohibit unfair competitive tactics like predatory pricing." The judge therefore held that the commission's decision was "arbitrary and capricious," and vacated the commission's decision and penalties.
The commission appealed from the motion judge's ruling, and we transferred the appeal to this court on our own motion.
Discussion. "A final agency decision may be set aside or modified on judicial review under G. L. c. 30A, § 14, where, among other reasons, it ... is '[b]ased upon an error of law,' under § 14 (7) (c ) ; or is 'arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law,' under § 14 (7) (g )." Craft, 481 Mass. at 511-512, 117 N.E.3d 676. Here, the issue essentially is whether the commission *975 made an error of law in interpreting its own regulation -- § 2.04(1) -- to prohibit Total Wine from selling liquor or wine at a price less than the net cost per bottle that appeared on the original invoice, even where a subsequent credit invoice reflected a CQD that, if applied to the liquor or wine earlier purchased, would have reduced the net cost per bottle below the retail price.
Our review of questions of law is de novo. Craft, 481 Mass. at 512, 117 N.E.3d 676. "We interpret a regulation in the same manner as a statute, and according to traditional rules of construction." Warcewicz v. Department of Envtl. Protection, 410 Mass. 548, 550, 574 N.E.2d 364 (1991). Two relevant rules of construction apply to this case. First, we look to the text of the regulation, and will apply the clear meaning of unambiguous words unless doing so would lead to an absurd result. See Worcester v. College Hill Props., LLC, 465 Mass. 134, 138, 987 N.E.2d 1236 (2013). Second, "we are generous in our deference to administrative agencies in their interpretation of their own regulations," ensuring only that their interpretation is reasonable. Craft, supra at 525, 527, 117 N.E.3d 676.
We conclude that the commission correctly interpreted the plain language of the regulation, and that its interpretation is reasonable and does not lead to an absurd result. Section 2.04(1) provides that a licensee may not sell alcoholic beverages below the "net cost appearing on the invoice for said alcoholic beverage." It is reasonable for the commission to interpret that language to mean that a retail licensee may not sell liquor or wine **688 below the net cost on the invoice reflecting the purchase from the wholesaler of that liquor or wine. Total Wine paid the wholesaler the net cost listed on this invoice when it purchased the liquor or wine; the CQD granted as a result of this bulk purchase was credited against future purchases, not against the original purchase, and was nowhere reflected in the invoice for this purchase. By expressly referencing "the invoice for said alcoholic beverage," § 2.04(1) contemplates the cost of goods as reflected in a single invoice. It is reasonable to infer that this invoice is the invoice that a buyer receives at the time of purchase, which -- at least in this record -- displays a full picture of the quantity of goods purchased, the cost per case and per bottle, and any discounts received that are applied to the purchase price. Therefore, because the regulation refers to one invoice, it follows that "net cost" refers to the net cost as appearing on that invoice. We thus reject Total Wine's argument that "net cost" includes all discounts and credits, present and future, regardless of whether they appear on the original purchase invoice.
Total Wine's interpretation of § 2.04(1) is not only contrary to the plain meaning of its language but would also run afoul of 204 Code Mass. Regs. § 2.02(2) (1993), which forbids a retail licensee from accepting an invoice "which falsely indicates prices, discounts, or terms of sale," or that withholds information that causes the invoice to "not truly reflect the transaction involved."[5] If the CQD truly were a discount *976 for the sale of liquor or wine reflected in the invoice for that sale, it would need to be shown on that invoice, because otherwise the invoice would not truly reflect the net price of the transaction.
Total Wine contends that the commission's interpretation of the regulation is inconsistent with the commission's enabling legislation, and that the commission's rigid requirement that all discounts appear on a single invoice is fundamentally unreasonable. We disagree with both of these arguments.
**689 We construe agency regulations in a manner "consistent with the legislative design." TBI, Inc. v. Board of Health of N. Andover, 431 Mass. 9, 15, 725 N.E.2d 188 (2000). Enacted in 1933 in anticipation of the end of the Prohibition era, the Liquor Control Act, G. L. (Ter. Ed.) c. 138, as appearing in St. 1933, c. 376, § 2, gave the alcoholic beverages control commission broad powers to "make regulations not inconsistent with the provisions of this chapter for clarifying, carrying out, enforcing and preventing violation of ... all and any of its provisions ... for the proper and orderly conduct of the licensed business." G. L. c. 138, § 24. See Craft, 481 Mass. at 512-514, 117 N.E.3d 676.
Among the provisions of the Liquor Control Act that the commission is tasked to enforce are several statutes that prohibit anticompetitive practices. For example, G. L. c. 138, § 25C (f ), provides that "[n]o licensee authorized to sell alcoholic beverages at retail for off-premises consumption shall sell ... any alcoholic beverages at a price less than the minimum consumer resale price then in effect, unless written permission of the commission is granted for good cause shown." The commission is also authorized to make rules that "are necessary ... to prevent circumvention of the provisions of [ § 25C ] by the offering or giving of any rebate, allowance, free goods, discount or any other thing or service of value." G. L. c. 138, § 25C (g ). In enforcing § 25C, the commission is empowered to root out forms of predatory pricing, such as "below-cost" pricing, that threaten to "eliminat[e] competitors in the short run and reduc[e] competition in the long run," harming businesses and consumers alike. Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 117, 118, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). See Kneeland Liquor, Inc. v. Alcoholic Beverages Control Comm'n, 345 Mass. 228, 233, 186 N.E.2d 593 (1962) ("establishment of [minimum] retail prices for customers of retail stores is an exercise of the police power in order to promote temperance, to stabilize the business, to avoid price wars, to instill observance of the law, and to protect the public").
In addition, G. L. c. 138, § 25A, forbids any licensee authorized to sell alcoholic beverages to wholesalers or retailers to "[d]iscriminate, directly or indirectly, in price, in discounts for time of payment or in discounts on quantity of merchandise sold, between one wholesaler and another wholesaler, or between one retailer and another retailer purchasing alcoholic beverages bearing the same brand or trade name and of like age and quality." In enforcing § 25A, the commission is empowered to prevent price **690 discrimination that would allow suppliers or wholesalers to favor particular licensees. See Craft, 481 Mass. at 514, 117 N.E.3d 676, quoting Grubb, Exorcising the Ghosts of the Past: An Exploration of Alcoholic Beverage Regulation in Oklahoma, 37 Okla. City U. L. Rev. 289, 298 (2012) (noting need to counteract *977 danger of "tied houses," that is, "reciprocal relationship[s] between saloon owners and manufacturers of alcoholic beverages that existed before Prohibition"). Through the promulgation and enforcement of 204 Code Mass. Regs. § 2.04(1), the commission prevents predatory pricing by forbidding a package store from selling "any alcoholic beverages at a price less than invoiced cost," and guards against hidden predatory pricing and price discrimination by requiring the net cost, less any discounts, to appear "on the invoice for said alcoholic beverage."
To be sure, as Total Wine argues, the commission potentially could attempt to enforce its minimum price rules and its prohibition against price discrimination without requiring all discounts to be identified on the invoice for a particular sale. But it would be considerably more difficult to do so. Section 2.04(1) simplifies the enforcement of commission rules by permitting investigators to look at a single invoice for a particular sale of liquor or wine and determine whether the retailer is selling below minimum price, because the sales price cannot be below the net cost shown on the invoice. The regulation also allows investigators to easily evaluate whether the licensed wholesaler is engaging in price discrimination because the price and all discounts for the sale to that licensed retailer must be shown on that invoice.
Total Wine argues that it would be a simple matter for the commission merely to incorporate by reference either the CQDs listed on the subsequently issued invoices, or the CQDs as advertised in the Massachusetts Beverage Journal. But this would be far from simple in practice. A CQD is a credit that may be applied to any future purchase by the retailer. How are the commission's investigators to know, by looking at a credit invoice reflecting the receipt of CQDs, whether a CQD is being "factored into" the price of the wine or liquor the purchase of which earned the CQD, or applied to a future purchase? With respect to an example emerging from this record, how are the commission's investigators to know how to "factor" a four dollars per case CQD into the price of the purchase of 200 cases of a brand of wine, where the credit increases to six dollars per case if the retailer were to purchase another one hundred cases during **691 the promotional time period? How are the commission's investigators to know how to "factor" a CQD into the price if the invoice for that purchase of wine reflected the sale of only 150 cases of wine, too few to even trigger the CQD of four dollars per case, but the retailer later made purchases during the promotional period of another one hundred cases, triggering the CQD of four dollars per case, and then another one hundred cases, triggering the CQD of six dollars per case? And what if, for example, a CQD is never actually applied toward future purchases, either by error or because a retailer or wholesaler goes out of business?
Total Wine asserts that the commission's administrative challenges in enforcing § 2.04(1) can be "easily resolved" by simply "having the targeted retailer provide the fact finder with all documentation issued to it by the wholesaler regarding the cost of alcoholic beverages." In other words, Total Wine argues that it can solve the administrability problem by submitting its own calculations to the commission. But this would allow a retailer, after it learns it is under investigation, to declare -- without any regard for the regulatory definition of "cost" as "net cost appearing on the invoice for said alcoholic beverage"-- which subsequent credits it would apply to earlier purchases so that the sales price would exceed the net purchase price (emphasis added). 204 Code Mass. Regs. § 2.04(1). And this does not resolve the uncertainty *978 regarding contingent or changing CQDs. For example, in at least one instance, a wholesaler sent an e-mail message to Total Wine to indicate that one credit was being adjusted to "$4.00 not $8.00 as previously published," and another credit was being added to the effect of "an additional $10 case on top of current pricing or free good deals." In order to effectively enforce its regulations, the commission must be able to account for these variables at the time of sale.
The 1933 Report of the Special Committee on Liquor Legislation, which was relied upon by the Legislature in its enactment of the Liquor Control Act, see Connolly v. Alcoholic Beverages Control Comm'n, 334 Mass. 613, 617 n.1, 138 N.E.2d 131 (1956), recognized that "[a] law to be effective must be possible of reasonable enforcement." 1933 Senate Doc. No. 494, at 6. As an agency "concerned with ... setting enforcement policy," the commission is vested with "particularly broad" discretion to define how it must exercise that role. See Levy v. Board of Registration & Discipline in Med., 378 Mass. 519, 525, 392 N.E.2d 1036 (1979), quoting **692 Greater Boston Tel. Corp. v. Federal Communications Comm'n, 444 F.2d 841, 857 (D.C. Cir. 1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). See also Leather Indus. of Am., Inc. v. Environmental Protection Agency, 40 F.3d 392, 403 (D.C. Cir. 1994) ("An agency has discretion to design rules that can be broadly applied, sacrificing some measure of 'fit' for administrability"). We do not think it unreasonable for an agency with limited resources to prioritize administrability in order to "avoid[ ] ... continuing uncertainty that would inevitably accompany any purely case-by-case approach like the one [Total Wine] advocates" (quotation and citation omitted). Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 59, 131 S.Ct. 704, 178 L.Ed.2d 588 (2011). Nor is it unreasonable for the commission to guard against its investigators needing to cobble together an undefined amount of paperwork in order to document the actual net "cost" of each and every bottle of liquor or wine. The commission's interpretation of § 2.04(1), which requires all pricing variables to appear on the same document, avoids all of the uncertainties discussed supra by providing for a uniform, bright-line rule to guide its enforcement -- one that comports directly with the plain text of the regulation. It naturally follows that requiring all discounts and credits to appear on the single invoice applicable to a sale of liquor or wine is a reasonable means of ensuring compliance with the statutes and rules the commission is obligated to enforce.
The commission's interpretation of § 2.04(1) does not prevent retail licensees from taking advantage of CQDs or passing those credits on to customers in the form of lower prices, so long as they do not discount the price of an alcoholic beverage below the statutory minimum price under G. L. c. 138, § 25C. The CQDs need only be applied within the restrictions clearly set forth by commission regulations -- that is, like any other discount, when the credit is applied to the sale of any liquor or wine, the credit must appear on the invoice for that sale. Contrary to Total Wine's argument, this outcome does not prevent the savings from CQDs from being passed onto consumers; the consumers will receive the same economic benefit if and when the CQDs are applied to a future purchase.[6] ,[7]
**693 Conclusion. For the reasons discussed supra, we conclude that, in view of the *979 plain language of § 2.04(1), and the commission's need to effectively and uniformly enforce its own regulations in accordance with its legislative mandate, the commission's decision was not arbitrary and capricious or otherwise unreasonable. Accordingly, the order of the Superior Court judge granting Total Wine's cross motion for judgment on the pleadings is reversed, and the case is remanded to the Superior Court with instructions to allow the commission's cross motion for judgment on the pleadings and enter judgment in favor of the commission.
So ordered.

Title 204 Code Mass. Regs. § 2.04(1) (1993) provides in full:
"No holder of a license issued under [G. L. c. 138, § 15,] shall sell or offer to sell any alcoholic beverages at a price less than invoiced cost. Cost is defined as net cost appearing on the invoice for said alcoholic beverage. The use of any device, promotion or scheme which results in the sale of alcoholic beverages at less than invoiced cost is prohibited."

We acknowledge the amicus brief submitted by Massachusetts Package Store Association, Inc.

Total Wine describes the Massachusetts Beverage Journal as "a periodic compendium of all [alcoholic beverage] products sold in ... Massachusetts along with their supplier and wholesale prices."

Title 204 Code Mass. Regs. § 2.02(2) (1993) provides in full:
"No licensee shall print, post, publish or use any false or fictitious price list; nor shall any invoice given or accepted by any licensee contain any statement which falsely indicates prices, discounts, or terms of sale; nor shall there be inserted in any invoice given or accepted by any licensee any statement which makes the invoice a false record, wholly or in part, of the transaction represented therein; nor shall there be withheld from any invoice given or accepted by any licensee any statements which properly should be included therein, so that in the absence of such statements the invoice does not truly reflect the transaction involved."

For the same reason, we are not persuaded by Total Wine's assertion that the commission's interpretation of § 2.04(1) violates the Sherman Act, 15 U.S.C. § 1, as an unlawful restraint on trade. See Canterbury Liquors & Pantry v. Sullivan, 16 F. Supp. 2d 41, 47 (D. Mass. 1998), quoting United States v. Container Corp., 393 U.S. 333, 337, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) ("interference with the setting of price by free market forces is unlawful per se"). Total Wine acknowledges that "the credits were applied to [its] next purchase (which could be for any number of products)." Therefore, whether a CQD is applied retroactively or passed on as a credit toward future purchases, the cost savings may still be passed on to the consumer by the retailer; all that might change is the timing of those cost savings.

We recognize Total Wine's concern that retailers do not have complete control over the invoices that wholesalers issue to them. However, it is the wholesalers that choose to offer purchase incentives, such as prompt payment discounts and CQDs, and it is presumably in their best interest to ensure that retailers can take advantage of those discounts while complying with the law. That reality is demonstrated by the e-mail records in this case, which reveal that wholesalers routinely sought to reassure Total Wine that it would be issued the CQDs for which it qualified. Moreover, the licensed retailer is legally responsible to ensure that the invoices it receives from the licensed wholesaler are accurate. See 204 Code Mass. Regs. § 2.02(2) ("nor shall any invoice given or accepted by any licensee contain any statement which falsely indicates prices, discounts, or terms of sale" [emphasis added] ).